**FRATERNAL ORDER OF POLICE, ILLINOIS STATE TROOPERS, LODGE NO. 41, Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 87–1358.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1987.

Decided Nov. 17, 1987.

Rehearing Denied Dec. 15, 1987.

718

Richard L. Meives, Vassen, Vetter & Meives, P.C., Belleville, Ill., for petitioner-appellant.

Jane S. Kimball, Asst. Atty. Gen., Tax Div. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before BAUER, Chief Judge, KANNE, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

BAUER, Chief Judge.

The Fraternal Order of Police ("FOP") appeals from a decision of the United States Tax Court that found FOP deficient in income tax payments for the taxable years September 30, 1976 through September 30, 1980.[1]

The issues on appeal are whether income received from certain listings printed in *The Trooper*, a magazine published by FOP, constitute taxable income derived from an unrelated trade or business under section 511 of the Internal Revenue Code of 1954 (26 U.S.C.) ("the Code"), and if so, whether such receipts are excludable as royalties from the unrelated business tax income under section 512(b)(2) of the Code. The Tax Court concluded that such income is taxable. We affirm.

I.

TAX COURT FINDINGS OF FACT

The relevant facts found by the Tax Court are as follows: FOP is a not-for-profit corporation organized under Illinois law and has its principal place of business in

1. The Tax Court determined the deficiencies in FOP's income tax as follows:

| YEAR ENDED SEPTEMBER 30 | DEFICIENCY |
| --- | --- |
| 1976 | $65,769.80 |
| 1977 | $83,174.05 |
| 1978 | $42,677.52 |
| 1979 | $47,620.63 |
| 1980 | $94,353.90 |

Springfield, Illinois. FOP is an exempt organization under section 501(c)(8) of the Code. Its active members are regularly appointed and commissioned police officers in the Illinois Department of Law Enforcement or troopers in the Illinois State Police. FOP's constitution and bylaws state that its purpose is to assist worthy members, their families, widows, and orphans.

In August, 1975, FOP formed the Troopers Alliance ("Alliance"). Alliance had basically the same membership as FOP and was formed to carry out the specific goal of providing money for hospitalization and dental programs for members and their families.

In September, 1975, Alliance entered into a Solicitation and Publishing Agreement ("Agreement I") with Organization Services Corporation ("OSC") for the publication of a magazine known as *The Trooper.* Under Agreement I, Alliance was to receive 20 percent of the "gross advertising revenue actually collected" by OSC. Agreement I referred to persons who place "listings" in the magazine as "advertisers" and to "listings" as "advertising." The solicitation program was referred to as the "ad solicitation program," the "advertising marketing program," and the "marketing of advertising." Agreement I also provided that OSC was to determine the "advertising rates ... for local and national advertisers" and referred to the receipts to be derived from the contracts as "advertising revenue."

On December 20, 1975, Alliance assigned all of its rights, title, and interest in Agreement I to FOP. On December 23, 1975, FOP and OSC cancelled Agreement I and entered into a Second Solicitation and Publishing Agreement ("Agreement II"). Agreement II was identical in all material respects to Agreement I, except that under Agreement II FOP was given greater control over the bank account into which the revenues were deposited. FOP's executive committee was then informed that Alliance had been disbanded and that its "ad solici-

tation program" would thereafter be conducted by FOP. The committee also was advised that future proceeds from the program would be used to provide death benefits, legal assistance, scholarships, hardship assistance, and possibly dental insurance for FOP members and their families.

On December 24, 1978, FOP and OSC entered into another publishing agreement ("Agreement III"). Agreement III provided that OSC was to publish each issue of *The Trooper* within ten weeks after having collected $150,000 in "advertising revenue." Agreement III also increased FOP's share of "gross advertising revenue actually collected" from 20 percent to 23 percent.

*The Trooper* is comparable in quality to most nationally published commercial magazines and in content is almost identical to *Law and Order,* an independent magazine published for policemen. Its editorials and articles are of particular interest to police officers and cover a wide range of professional, commercial, consumer, and leisure topics. *The Trooper's* circulation during the years in issue was approximately 2,000. Copies were distributed to FOP members and associate members, businesses and individuals having listings in *The Trooper,* Illinois legislators and other public officials, as well as other persons designated by FOP from time to time.[2] One of FOP's officers served as executive editor of the magazine and FOP had the right to censor text, editorials, and business listings, as well as to control any reprints.

The business listings in *The Trooper* were of two types, both of which covered a wide range of professional, commercial, consumer, and leisure goods or services. The first type of listing was the Business Directory, which classified and arranged the listers in the same manner as the "yellow pages" of a telephone directory. This statement from the editors preceded the Business Directory:

ON THE FOLLOWING PAGES, listed by category of service or product, are

---

*Fraternal Order of Police, Illinois State Troopers Lodge No. 41 v. Commissioner of Internal Revenue,* 87 T.C. No. 45 (1986).

2. Copies of *The Trooper* were not always distributed to its sponsors because of the cost involved.

advertisers who support *The Trooper* magazine. Consider these fine companies when making purchases for yourself or your family.

The second type of listings were referred to as "large listings" and included such well known companies or products as American Airlines, Michelob Beer, Johnny Carson Clothes, Midas Mufflers, and Ryder Trucks. *The Trooper* had an "Advertisers' Index" which contained the name of the sponsor of each large listing and the page upon which its listing was located. Large listings contained the usual elements associated with advertisement such as blocking, illustrations, signatures, trademarks and emblems. Many of the large listings contained well-known slogans used by the sponsors in their national advertising campaigns.

OSC employed an independent contractor to solicit listings from individuals and corporations. The contractor or one of his employees would contact a potential lister and, after a brief introduction, would inform the potential lister that FOP was putting together the next issue of *The Trooper* and that the proceeds from the published listing would add to FOP's death fund to aid the families of policemen and troopers killed or injured in the line of duty. The solicitor would then ask the potential lister to sponsor a "nice listing" in the magazine. All solicitations were monitored by FOP members. Businesses listing in *The Trooper* often noted on their checks that the payments were for "advertising." More-

over, the bank account for the "advertising marketing program" was in FOP's name and was controlled by FOP.

During the years 1976–1980, FOP received a total of $4,625,106.07 from the business listings in *The Trooper*. In its unrelated business taxable income for the taxable years ended September 30, 1976 through September 30, 1979, FOP included as "gross advertising income" receipts from the large listings but not the receipts from the Business Directory. For the taxable years ended September 30, 1980, none of the listing receipts were included in unrelated business taxable income.

## II.

As noted above, FOP is a tax-exempt organization under section 501(c)(6) of the Internal Revenue Code, which provides an exemption for organizations "not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual." 26 U.S.C. § 501(c)(6). The Code, however, does impose a tax, at ordinary corporate rates, on the income that a tax-exempt organization receives from an "unrelated trade or business ... regularly carried on by it." 26 U.S.C. §§ 512(a)(1), 511(a)(1). The Code defines an "unrelated trade or business" as "any trade or business the conduct of which is not substantially related ... to the exercise or performance by such organization of its charitable, educational, or other purpose," § 513(a).[3] *See United States v.*

---

3. Section 513 provides in pertinent part:

(a) *General Rule.*—The term "unrelated trade or business" means, in the case of any organization subject to the tax imposed by section 511, any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 (or, in the case of a organization described in section 511(a)(2)(B), to the exercise or performance of any purpose or function described in section 501(c)(3)), except that such term does not include any trade or business—

(1) in which substantially all the work in carrying on such trade or business is performed for the organization without compensation; or

\*   \*   \*   \*   \*   \*

(3) which is the selling of merchandise, substantially all of which has been received by the organization as gifts or contributions.

\*   \*   \*   \*   \*   \*

(c) [as amended by Sec. 121(c), Tax Reform Act of 1969, *supra* ] *Advertising Etc., Activities.* —For purposes of this section, the term "trade or business" includes any activity which is carried on for the production of income from the sale of goods or the performance of services. For purposes of the preceding sentence, an activity does not lose identity as a trade or business merely because it is carried on within a larger aggregate of similar activi-

*American College of Physicians,* 475 U.S. 834, 106 S.Ct. 1591, 1594, 89 L.Ed.2d 841 (1986); *United States v. American Bar Endowment,* 477 U.S. 105, 106 S.Ct. 2426, 2430, 91 L.Ed.2d 89 (1986); *Illinois Ass'n of Professional Ins. Agents v. Commissioner of Internal Revenue,* 801 F.2d 987, 988 (7th Cir.1986). Under the Code's three-part test, a tax-exempt organization, like FOP, must pay taxes on income earned from the listings in *The Trooper* if this activity "(1) constitutes a trade or business; (2) is regularly carried on; and (3) is not substantially related to [FOP's] tax-exempt purposes." *American Bar Endowment,* 106 S.Ct. at 2430; *Illinois Ass'n of Professional Ins. Agents,* 801 F.2d at 988; 26 C.F.R. 1.513–1(a); 26 U.S.C. §§ 512(a), 513(a).

FOP concedes that the publication of the paid business listings in *The Trooper* is "regularly carried on" and is "not substantially related" to the organization's tax-exempt purposes. Nevertheless, FOP contends that income earned from the paid listings are not taxable because their publication does not constitute a "trade or business" under section 513(c). On appeal, FOP also asserts that the coverage of section 513(c) does not extend to noncommercial advertising.

### A.

### ADVERTISING

■ Because of the findings of the Tax Court, we need not decide whether section 513(c) makes a distinction between commercial and noncommercial advertising. Although the Tax Court did not explicitly label the paid business listings as "commercial," its conclusion that the listings constitute advertising rested on the commercial nature of the published listings. The Tax Court found that the "vast majority" of the listings found in *The Trooper* were similar, if not identical, in "content, composition and message" to the commercial listings found in journals, newspapers, and the

"yellow pages" of the telephone directory. Many of the listings also included well-known slogans used by sponsors in their national advertising campaigns as well as coupons which could be cut out and redeemed by their bearer.

Despite this, FOP contends that its sponsors merely intended to contribute to FOP and did not intend to advertise in the commercial sense. Undoubtedly, many, perhaps most, of FOP's sponsors were motivated by a sincere desire to help support the families of officers killed in the line of duty. Nevertheless, this motivation does not define FOP's activities. To place a listing in *The Trooper,* each sponsor had to purchase a space and pay a prescribed rate which corresponded to the desired size of the listing. Moreover, each issue of *The Trooper* included the request by the editors that its readers patronize those who had paid for the listings.

The Tax Court determined that FOP's activities constituted commercial advertising based on the evidence and testimony before it. We will not reverse the Tax Court's findings of fact unless we find them clearly erroneous. *Cassidy v. Commissioner of Internal Revenue,* 814 F.2d 477, 481 (7th Cir.1987); *Burger v. Commissioner of Internal Revenue,* 809 F.2d 355, 358 (7th Cir.1987). Given the strength of this record we find that the Tax Court's conclusion that the paid listings constituted commercial advertising not exempted from Section 513 is not clearly erroneous; indeed, it is almost compelled.

### B.

### TRADE OR BUSINESS

■ FOP's argument that its listings do not constitute a trade or business also are without merit. Congress has defined a "trade or business" as "any activity which is carried on for the production of goods or the performance of services." *American Bar Endowment,* 106 S.Ct. at 2430. The

---

ties or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization. Where an activity carried on for profit consti-

tutes an unrelated trade or business, no part of such trade or business shall be excluded from such classification merely because it does not result in profit.

Treasury Department regulations further clarify this definition as it relates to advertising:

> ... activities of soliciting, selling, and publishing commercial advertising do not lose identity as a trade or business even though the advertising is published in an exempt organization periodical which contains editorial matter related to the exempt purposes of the organization.

26 C.F.R. § 1.513–1(b).

The publication of paid listings in *The Trooper* appears to fall under the plain language of section 513(c). Clearly, FOP intended to produce income from the sale of space in its magazine to various sponsors. This fact cannot be ignored, regardless of the sponsors' motives or intentions. (Needless to say, FOP's activities were also quite profitable.)

The Supreme Court has recently removed any remaining doubts on whether paid advertising constitutes a "trade or business" under section 513(c). In *American College of Physicians,* the Court found that "Congress has declared unambiguously that the publication of paid advertising is a trade or business activity distinct from the publication of accompanying education articles and editorial comment." *American College of Physicians,* 106 S.Ct. at 1595.

█ FOP contends that this court must find that its advertising amounted to unfair competition with other advertisers in order for its activity to constitute a "trade or business." Although the Supreme Court has recognized that the "undisputed purpose of the unrelated business income tax was to prevent tax-exempt organizations from competing unfairly with businesses whose earnings were taxed," *American Bar Endowment,* 106 S.Ct. at 2431, this is certainly not the only factor a court must consider in determining whether an activity of a tax-exempt organization constitutes a "trade or business." In the same opinion, the Court focused on whether the sale of insurance to its members by the *American Bar Endowment,* a tax-exempt organization, was the type of activity "provided by private commercial entities in order to make a profit." *Id.* at 2430. The Court noted that the "standard test for the existence of a trade or business for purposes of § 162 is whether the activity 'was entered into with the dominant hope and intent of realizing a profit.'" *Id.* at 2430 n. 1 (citations omitted). After concluding that the American Bar Endowment was motivated by profit, the Court also considered whether its activities were anti-competitive. The Court found that the American Bar Endowment's activities "present[ed] a potential for unfair competition." *American Bar Endowment,* 106 S.Ct. 2432. In concluding that the American Bar Endowment's insurance program did unfairly compete, the Court relied on hypothetical possibilities, rather than on an actual finding of unfair competition. *Id.* at 2432–33. *See also id.* at 2436 (Stevens, J., dissenting).

█ Just recently, this Court tried to reconcile the profit motive test and the unfair competition test in light of *American Bar Endowment. Illinois Ass'n of Professional Ins. Agents,* 801 F.2d 987. This court found that these two lines of cases are not in conflict.

> No court has yet created a general exception to the unrelated business income tax based solely on a showing that the tax-exempt organization did not compete, or threaten to compete, unfairly with tax-paying entities. Rather, the cases hold that activities engaged in for the production of income do not constitute a "trade or business" within the meaning of section 513(c) where the income is derived from charitable contributions rather than from the sale of goods or the performance of a service.

*Id.* at 991 n. 4. Although preventing unfair competition is the major purpose of the unrelated business income tax, a specific finding of unfair competition is not always required to determine which activities constitute a trade or business. *American Bar Endowment* teaches that when an activity is carried out by a tax-exempt organization with the dominant intent of making a profit, this can present sufficient likelihood of unfair competition to be within the policy of the tax without a showing of actual

unfair competition. *American Bar Endowment*, 106 S.Ct. at 2432; *Illinois Ass'n of Professional Ins. Agents*, 801 F.2d at 991 n. 4; § 1.513–1(b). Contrary to FOP's assertion, the evidence and potential of unfair competition is only one factor a court must consider along with the organization's profit motive, but it is not dispositive.

FOP does not dispute that it intended to, and did, profit from the sale of its published listings. The Tax Court found that FOP formed the Alliance and published *The Trooper* with the "specific goal" of raising money for the services provided by its members. The magazine raised over $4.5 million during the five years of its publication. Moreover, FOP's arrangement with OSC was such that FOP maximized its revenue while minimizing its risk by resting its share of the profits on gross, not net, revenue. Although the Tax Court did not address directly the unfair competition issue, the record below shows that *The Trooper* was similar to other national publications and almost identical to *Law and Order*, another magazine for police officers published for profit. Thus, it is likely that these other publications suffered the ill effects of competing with *The Trooper's* lower costs.

### III.

### ROYALTIES

■ Finally, FOP argues that even if its sale of space for business listings constitutes "unrelated business taxable income" under section 513, these receipts are "royalties" and are excluded from taxation by section 512. Section 512(a)(1) states the general rule that

> [e]xcept as otherwise provided ... the term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business (as defined in Section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business, both computed with the modifications provided in subsection (b).

The modification upon which FOP relies provides that "there shall be excluded all royalties ... whether measured by production or by gross or by taxable income from the property...." § 512(b)(2). Both parties agree that a royalty is a payment for the use of a right, such as a trademark, trade name, service mark, or copyright, regardless of whether the property represented by the right is used. *See, e.g., Commissioner v. Wodehouse*, 337 U.S. 369, 69 S.Ct. 1120, 93 L.Ed. 1419, *reh. denied*, 338 U.S. 840, 70 S.Ct. 31, 94 L.Ed. 514 (1949); *Rohmer v. Commissioner*, 153 F.2d 61 (2d Cir.), *cert. denied*, 328 U.S. 862, 66 S.Ct. 1367, 90 L.Ed. 1632 (1946). Both parties also agree with the rule that the "royalties" which are immune from tax are those which constitute passive income, "such as the compensation paid by a licensee to the licensor for the use of the licensor's patented invention." *Disabled American Veterans v. United States*, 650 F.2d 1178, 1189 (Ct.Cl.1981). FOP's only disagreement with the Tax Court's decision in this area concerns its finding that FOP took an active, not passive role, in the publication of *The Trooper.*

The regulations require that an assessment of whether certain income falls within one of the modifications provided in section 512(b) must be determined from all the facts and circumstances of each case. C.F. R. § 1.512(b)–1. We find that the Tax Court made such a determination and that its finding that FOP was an active participant in the publication of *The Trooper* is not clearly erroneous.

The record below establishes that, through it's agreements with OSC, FOP had the final authority over the editorial content of each issue of *The Trooper*, could appoint the magazine's executive editor, could prepare the editorials and feature articles, could oversee and control the solicitor's activities in the business listings program, and could control the program's bank account and the reprint of any material published in *The Trooper*. It also is clear that FOP and OSC shared in the proceeds from the listings solicitation program. We, therefore, hold that the Tax

Court's findings in this respect were not clearly erroneous.

## IV.

For the foregoing reasons, we affirm the rulings of the Tax Court.