No. 97-1319

STATE POLICE ASSOCIATION OF MASSACHUSETTS,

Petitioner, Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellee.



APPEAL FROM THE UNITED STATES TAX COURT

[Hon. Thomas B. Wells, Judge]



Before

Selya and Lynch, Circuit Judges,

and Pollak,* Senior District Judge.



Alfred  J.  O'Donovan, with whom Michelle  H.  Blauner and
Shapiro, Haber & Urmy were on brief, for appellant.
Teresa  T.  Milton, Attorney, Tax Division, U.S. Dep't of
Justice, with whom  Loretta C. Argrett , Assistant Attorney General,
and Kenneth L. Greene, Attorney, Tax Division, were on brief, for
appellee.



August 20, 1997



*Of the Eastern District of Pennsylvania, sitting by designation.

SELYA,  Circuit Judge . In this case, the Commissioner of

the Internal Revenue Service (the Commissioner) issued a deficiency

notice to the State Police Association of Massachusetts (the

Association) for income taxes allegedly due but unpaid. When the

Association protested, the Tax Court sided with the Commissioner.

See State  Police  Ass'n  of  Mass. v. Commissioner, 72 T.C.M. (CCH)

582 (1996) (Tax Ct. Op.). The Association appeals, contending that

the Tax Court erred both in finding that the deficiency assessment

was timely and in holding that certain of the Association's

activities gave rise to liability for unrelated business income

tax. We affirm.

I. BACKGROUND

The Association is a labor organization, and, as such, is

exempt from income taxes under 26 U.S.C. S 501(c)(5) (1994). The

purpose of the organization is to represent its members in

bargaining over the terms and conditions of their employment and to

promote a fraternal spirit among members. Virtually all the

troopers who are eligible to join the Association do so.

During the years at issue, the Association published an

annual yearbook, known as  The  Constabulary. The yearbook consisted

of photographs, articles, display advertisements, and a business

directory. We describe infra the sales effort (which the

Association in more salubrious times called the "earnings program")

From this point forward, we will refer to the applicable
provisions of the Tax Code, as they appeared on the date(s) in
question, by using the preface "IRC." To illustrate, 26 U.S.C. S
501(c)(5) will be cited as IRC S 501(c)(5), and so on and so forth.

2

and the mechanics of publication and distribution. It is enough

for now to say that the earnings program proved to be aptly named:

gross receipts related to the publication of The Constabulary for

the years at issue totalled $8,788,211. Of this amount, the

Association retained somewhat over 40% (the precise percentage

varied from year to year, and is of no consequence here). The

Association paid no tax on the income.

It is said that all good things come to an end. Federal

law requires that an otherwise tax-exempt organization must pay

federal income tax on income derived from business ventures which

are not substantially related to its tax-exempt purpose(s). See

IRC S 511. After due investigation, the Commissioner concluded

that the Association had violated this stricture because the sale

of advertising in  The  Constabulary yielded taxable income. Acting

on this conclusion, the Commissioner issued a deficiency notice

seeking $1,352,433 in taxes due for the tax years ended April 30,

1986 through April 30, 1989, the three months ended July 31, 1989,

and the tax years ended July 31, 1990 and 1991, along with

additions to tax and penalties totalling $711,075.

Displeased by this turn of events, the Association

brought suit in the Tax Court under IRC S 6213(a) to obtain a

redetermination of the taxes allegedly due. It claimed that, for

certain tax years, the notice of deficiency had been issued beyond

the applicable limitation period; and that, on a broader plane, the

activity cited by the Commissioner the solicitation, sale, and

publication of display ads and listings in The Constabulary did

3

not constitute an unrelated trade or business regularly carried on,

and that, therefore, the income derived from that activity was

exempt from tax. The Tax Court rejected both of these theses and

sustained the Commissioner's determination of the existence and

extent of the deficiency (although it eliminated the additions to

tax and the penalties). See Tax Ct. Op. at 589, 594. This appeal

ensued.

II. THE PUTATIVE TIME BAR

The Association claims that the statute of limitations

bars the collection of taxes as to some or all of the affected

periods. The relevant facts are not in dispute. On August 3,

1992, the Association and the Commissioner, through their

authorized representatives, executed a form entitled "Consent to

Extend the Time to Assess Tax" (the Form). The Form, a copy of

which is reprinted in the appendix, permitted the Commissioner to

assess income tax on or before April 30, 1993, for the contested

periods through July 31, 1989. The Commissioner assessed the taxes

allegedly due for these periods by issuing a deficiency notice on

April 22, 1993. The applicable limitation period is three years.

See IRC S 6501(a). If the Form sufficed to extend the limitation

period, then the deficiency notice was timely as to all the tax

years at issue; if not, the Commissioner's claim for certain

periods is probably time-barred.

The Association advances a purely linguistic argument on

this point. It notes that the text of the Form provides for an

extension of the limitation period solely with respect to tax due

4

on "any return(s) made" by the Association during the periods in

question. The only returns so made were information returns, on

Form 990, entitled "Return of Organization Exempt from Income Tax."

By definition, no tax could possibly be due on an information

return. Taking this literal view, the Association contends that

the Form did not extend the limitation period at all.

The Tax Court refused to swallow this slippery syllogism.

It impliedly found the language of the Form ambiguous and construed

it as broad enough to include not only taxes due on returns made

but also taxes due on returns deemed to be made. See Tax Ct. Op.

at 589. Ascertaining the ambiguity vel non of a writing requires

a court to ask and answer a question of law, and, therefore, we

review this conclusion de novo. See IRC S 7482(c)(1);  see  also  RCI

Northeast Servs. Div. v.  Boston Edison Co. , 822 F.2d 199, 202 (1st

Cir. 1987).

The Tax Court's rendition withstands scrutiny. Tax forms

are rarely models of syntactical clarity, and the Form signed by

the parties is no exception. The Tax Court read the phrase

"return(s) made" as encompassing returns deemed to be made. This

construction strikes us as reasonable.

Words must be read in context. Though a plain vanilla

reading of the Form would support an inference that the parties

wished to extend the limitation period for assessing taxes due on

actual returns filed for the applicable periods, the context casts

a different light on the phrase "return(s) made." When one takes

into account that the only "returns made" were information returns

5

on which no tax could conceivably be due, and that the signatories

to the Form knew as much, the ambiguity of the phrase becomes

apparent.

Our thinking runs along the following lines. It would be

nonsensical to extend the limitation period for assessment of taxes

due on a return on which, by operation of law, no tax conceivably

could be due. The law, in turn, should be reluctant to insist that

courts construe a document in a way that leads to an absurd or

nonsensical result. Indeed, the maxim ut res magis valeat quam

pereat teaches that a written instrument ordinarily should be given

a meaning that will make it legally functional rather than a

meaning which will render it legally dysfunctional. See 3 Arthur

Linton Corbin, Corbin on Contracts S 532 (1960); see also Blackie

v. Maine, 75 F.3d 716, 722 (1st Cir. 1996). Thus, the very

implausibility of the Association's proposed construction suggests

that the phrase "return[s] made" must have some other meaning.

This conclusion is fortified by the wonted operation of

the relevant provisions of the Internal Revenue Code.

Specifically, a return relative to the unrelated business taxable

income of a normally tax-exempt organization (a so-called "990-T"

return) is deemed made, for purposes of starting the running of the

limitation period, when the information return (a so-called "990"

return) is in fact made. See California  Thoroughbred  Breeders

Ass'n v. Commissioner, 47 T.C. 335, 338 (1966) (construing IRC S

6501(g)(2)). Without this rule deeming the Association's 990

return to be a 990-T return, the statute of limitations that the

6

Association seeks to invoke would, presumably, not yet have begun

to run. The Association thus seeks to link the two forms for the

purposes of starting the limitations period, but would have us

decouple the forms in reviewing its agreement to extend that

period. Perhaps more important, reading the Form against the

backdrop of the California  Thoroughbred  Breeders rule suggests

another (broader) meaning for the phrase "return(s) made" a

meaning which extends to returns deemed made and thus highlights

the ambiguity of the Form.

That ends the matter. The presence of an ambiguity

permits a reviewing court to examine extrinsic evidence in an

effort to clarify the intent of the parties.  See  Smart v.  Gillette

Co.  Long-Term  Disability  Plan, 70 F.3d 173, 179 (1st Cir. 1995);

RCI  Northeast, 822 F.2d at 202. Here, the extrinsic evidence is

telling: the Association's reading of the Form contradicts what

even the Association admits was the parties' mutual intention to

extend the limitation period as to any unrelated business income

tax that might be due for the affected periods.

We need not linger. We resolve contractual ambiguity in

The court below suggested that, if it were unable to construe
the language in the Form to give effect to the parties' discerned
intention, it could reach the same result by reforming the
instrument. See Tax Ct. Op. at 589 n.4. In general, reformation
is available when a writing is clear on its face (i.e.,
unambiguous) but nonetheless misstates the parties' intent. See,
e.g.,  United States v.  Lumbermens Mut. Cas. Co. , 917 F.2d 654, 658
(1st Cir. 1990);  Rocanville Corp. v.  Natural Gas Pipeline Co. , 823
F.2d 92, 94 (5th Cir. 1987); see also Restatement (Second) of
Contracts S 155 (1979). The doctrine can be applied in tax cases.
See, e.g., Woods v. Commissioner, 92 T.C. 776, 782-83 (1989).
However, because we uphold the Tax Court's implicit finding that

7

favor of effectiveness, accept the discerned intent of the parties,

endorse the Tax Court's interpretation of the phrase "return[s]

made," and hold that the Form extended the limitation period as to

the assessment of unrelated business income tax. The notice of

deficiency was, therefore, timely as to all the contested tax

years.

III. THE MERITS

The gravamen of the Commissioner's case is the charge

that the activity undertaken in connection with publication of  The

Constabulary generated unrelated business taxable income. The

allegation that an activity engaged in by a tax-exempt organization

gives rise to unrelated business taxable income requires proof of

three components. The Commissioner must demonstrate (1) that the

activity comprises a trade or business, (2) which is regularly

carried on, and (3) which is not substantially related to the

organization's tax-exempt purpose. See United States v. American

Bar Endowment, 477 U.S. 105, 110 (1986); see also IRC S 513(a).

A.

At the gateway to this issue, the parties dispute the

standard of review. The Association asserts that the Tax Court's

findings that publication of  The  Constabulary involved a business

regularly carried on are subject to de novo review. The

the Form is ambiguous, we need not reach the reformation issue.

The Association does not mount a challenge on the third prong
of the tripartite test, instead conceding that if the activity
amounts to a regularly conducted trade or business, it is, as the
Tax Court found, not substantially related to the Association's

8

Commissioner maintains that these findings are entitled to greater

deference.

Congress has directed the courts of appeals to use the

same standards in reviewing Tax Court decisions that traditionally

are used in appellate review of district court decisions in civil

actions tried without a jury. See IRC S 7482(a). Consequently, we

evaluate the Tax Court's findings of fact under the clearly

erroneous standard. See  Commissioner v.  Duberstein, 363 U.S. 278,

291 (1960); Manzoli v. Commissioner, 904 F.2d 101, 103 (1st Cir.

1990); see also Fed. R. Civ. P. 52(a). This mode of review

requires us to accept the Tax Court's credibility determinations

and its findings about historical facts unless, after careful

evaluation of the evidence, we are left with an abiding conviction

that those determinations and findings are simply wrong. See

Reliance Steel Prods. Co. v.  National Fire Ins. Co. , 880 F.2d 575,

576 (1st Cir. 1989). Notwithstanding the clearly erroneous rule,

however, the Tax Court's ultimate conclusions (e.g., whether the

facts, as found, are legally sufficient to demonstrate that the

Association engaged in a trade or business) are conclusions of law,

and are therefore subject to de novo review.

On the merits, the Association advances two challenges:

it asserts that the activities in question did not constitute a

trade or business, and that in all events those activities were not

conducted with the requisite regularity. We address these

challenges sequentially.

tax-exempt purpose. See Tax Ct. Op. at 591.

9

B.

The operating paradigm permitted the Association to

exercise significant control over the sales effort, the handling of

the funds generated, and the publication of The Constabulary.

Under this paradigm, the Association contracted with an outside

firm (originally Brent-Wyatt East, and later R.H. McKnight Co.) to

publish the yearbook and recruit telemarketers. These

telemarketers were considered joint employees of the Association

and the outside firm. Groups of eight to twelve callers worked out

of field offices selected by the outside firm with the

Association's approval and solicited local and national businesses

within geographic areas demarcated by the Association. In so

doing, they utilized a canned solicitation format approved by the

Association, introducing themselves as calling on behalf of the

Association. Troopers monitored all solicitations to make certain

that the sales staff did not trespass into forbidden terrain. The

Association also retained the right to inspect, without prior

notice, the field offices from which solicitations took place.

Prospective customers were offered the opportunity to

purchase display advertisements and listings. Displays ranged in

size from one-sixth of a page to a full page, and, at the

purchaser's option, could contain text, logos, slogans, borders,

We describe the relationship as it existed through mid-1990,
under contractual arrangements with Brent-Wyatt East. Although the
contract signed with McKnight on June 20, 1990, contained some
variations, the Tax Court supportably found that these changes were
largely cosmetic and did not alter the essential character of the
relationship. See Tax Ct. Op. at 585.

10

and blocking. The fee charged for a display advertisement or a

directory listing varied in direct proportion to the size of the

display or listing and to the number of editions in which it

appeared. The Constabulary was arranged so that displays were

interspersed with editorial matter, and the publication contained

a so-called "Index to Advertisers." Listings were arranged by type

of product or service in a separate business directory section.

Payments for ads sold were made to the Association and

the Association deposited the receipts in its account. It made

weekly accountings retaining a stipulated percentage "off the

top" for itself, paying set percentages of the gross receipts to

the telemarketers and to the outside firm, defraying the costs

associated with solicitation and publication and kept any excess.

The Association published The Constabulary annually.

Association members acted as the editorial staff, writing and

editing articles for the publication and approving the contents of

the finished product. The Association distributed the yearbook

free of charge at various state troopers' barracks, the

Association's annual picnic (the "Police Chase"), and other

occasions. Copies were sometimes sent to advertisers.

Based on this scenario, the Commissioner's theory is that

the Association which from time to time called The Constabulary

an "ad book" and which, in its contract with Brent-Wyatt East,

referred to the latter's assignment as "marketing advertising" 

The Association produced five regional editions with common
editorial material.

11

engaged in the business of selling advertising. The Association

counters that it did not engage in that business; in its view, the

displays and listings were not advertising at all, but merely a

means of identifying sponsors. The Tax Court rejected this

contention, see Tax Ct. Op. at 590, and so do we.

Even a cursory glance at the yearbook, the pricing

structure, and the terminology used by the Association belies the

belated claim that the ads and listings were not "advertising" as

that term is commonly understood. Nor is the Association's

attempted recharacterization made any more palatable by its

reliance on Proposed Treas. Reg. S 1.513-4, 58 Fed. Reg. 5690, 5690

(1993). The proposed regulation describes the permissible contents

of acknowledgements of sponsorship payments; it allows value-

neutral descriptions of a sponsor's products or services, and logos

or slogans "that are an established part of a sponsor's identity."

See id. S 1.513-4(c). We need not decide, however, whether the

materials in The Constabulary meet these exacting criteria; the

proposed regulation, by its terms, does not apply to periodicals

produced by tax-exempt organizations. See id. S 1.513-4(a).

Putting the proposed regulation to one side, the

Commissioner's appraisal of The Constabulary's contents comports

with common sense: the displays look like ads, the directory

listings function as guides to products and services, and the

Association itself, at least during the first four years of the

undertaking, consistently referred to the displays and listings as

ads rather than as acknowledgements. That appraisal also is

12

supported by well-reasoned precedent.

Fraternal Order of Police, Etc. v.  Commissioner, 87 T.C.

747 (1986), aff'd, 833 F.2d 717 (7th Cir. 1987) (FOP), which also

involved the solicitation and sale of insertions in a publication

sponsored by a tax-exempt policemen's organization, bears a strong

resemblance to the case at bar. The Tax Court found that the

activity in question amounted to an unrelated business. 87 T.C. at

757. The Seventh Circuit affirmed this finding. 833 F.2d at 721-

22. The similarities are striking. There, as here, the

publication included display ads (using logos, slogans, and

blocking), a directory section, and a message asking readers to

patronize the businesses listed therein. See id. at 719-20.

There, as here, the size of an insertion was directly proportionate

to the price charged. See id. at 721. There, as here, the

sponsoring organization, prior to the time the Commissioner came

calling, characterized the disputed activity as advertising. See

id.

Given these similarities, FOP is powerful authority for

the Commissioner's position that the activity here in question

comprises a separate, unrelated business. We consider FOP

correctly decided, and we find unconvincing the Association's

attempts to distinguish it. Consequently, we hold that the Tax

In striving to reach escape velocity from  FOP's precedential
orbit, the Association relies heavily on its presentation of expert
testimony at trial. But this testimony was discounted by the Tax
Court because the expert was dismally uninformed. See Tax Ct. Op.
at 589-90. That determination was well within the trier's purview.
See  Seagate Tech., Inc. v.  Commissioner, 102 T.C. 149, 186 (1994).

13

Court did not commit clear error in finding that the Association's

solicitation, sale, and publication of displays and listings in  The

Constabulary constituted the business of advertising.

The Association's fallback position is its claim that the

Commissioner erred in treating the outside firms (Brent-Wyatt East

and McKnight, respectively) as agents of the Association (and,

thus, in attributing these firms' activities to the Association).

To bolster this claim, the Association stresses that the contract

documents required these firms to operate as independent

contractors. It follows, the Association says, that even if the

cited activities constituted the business of advertising, the

business belonged to the outside firms.

We are not persuaded. In the first place, an independent

contractor can be an agent if, and to the extent that, the

contractor acts for the benefit of another and under its control in

a particular transaction. See Restatement (Second) of Agency SS 2,

14N (1957). In the second place, the label which contracting

parties place on their relationship is not decisive of their status

vis-a-vis third parties. See Board  of  Trade v. Hammond  Elevator

Co., 198 U.S. 424, 437 (1905). Either way, answering the question

that the Association raises requires that we examine the substance

of the contracting parties' relationship.

In this analysis, no single factor is dispositive. See

Labor  Relations  Div.  of  Constr.  Indus. v. International  Bhd.  of

Teamsters, 29 F.3d 742, 748 (1st Cir. 1994). Rather, the nature of

the relationship between the Association and the outside firms

14

depends on a myriad of factors, including control over the manner

and means of performing the work, the skill required, the method of

payment, the duration of the relationship, and similar factors.

See,  e.g.,  Saenger Org., Inc. v.  Nationwide Ins. Licensing Assocs.,

Inc., F.3d , (1st Cir. 1997) [No. 96-2197, slip op. at

12];  Speen v.  Crown Clothing Corp. , 102 F.3d 625, 629-30 (1st Cir.

1996). The relevant factors here, taken as a whole, solidly

support the Tax Court's determination that the outside firms acted

as the Association's agents.

First and foremost, the manner in which the Association

conducted its affairs undercuts its claim that it lacked the

requisite degree of suasion over the outside firms' activities.

The Association retained very tight control over the method and

manner of solicitation, the ingredients of the sales pitch, the

identity of the solicitors, the financial aspects of the

arrangement, the use of its name, the advertising formats, and the

contents of the yearbook. We refer the reader who hungers for a

blow-by-blow account to the details set out in the opinion below.

See Tax Ct. Op. at 584-85. Without belaboring the point, it is

enough to say that the record reveals an ample factual predicate

for the finding that an agency relationship existed between the

Association and the outside firms.

C.

The Association's final contention is that, even if its

activities comprise a business attributable to it, that business

was not carried on regularly. To buttress this contention, the

15

Association makes two separate, but related, arguments.

Its first asseveration rests on the decisions in  National

Collegiate Athletic Ass'n v.  Commissioner, 914 F.2d 1417 (10th Cir.

1990) (NCAA), and Suffolk  County  Patrolmen's  Benevolent  Ass'n v.

Commissioner, 77 T.C. 1314 (1981). These decisions are inapposite.

In each instance, the advertising activity was tied to the program

for a specific event. See NCAA, 914 F.2d at 1420 (collegiate

basketball tournament);  Suffolk County , 77 T.C. at 1316 (vaudeville

show). Thus, resolution of those cases depended on Treas. Reg. S

1.513-1(c)(2)(ii), which specifically provides that "publication of

advertising in programs for sports events or music or drama

performances will not ordinarily be deemed to be the regular

carrying on of business." That regulation is of no assistance here

because the Tax Court found specially that the Association's

publication of  The  Constabulary was not linked to the occurrence of

a specific event, see Tax Ct. Op. at 593, and the Association has

not challenged that finding in this venue.

We hasten to add, moreover, that the mode of analysis

used in NCAA and Suffolk County cannot be employed here. Because

those cases each involved a particular event, they looked to the

time frame of the event in determining the regularity with which

the business was carried on. See NCAA, 914 F.2d at 1422-23;

Suffolk County , 77 T.C. at 1322-24. In a case like this one, where

It is interesting to note that Proposed Treas. Reg. S 1.513-4
draws a clear distinction between periodicals and material
published in connection with a specific sponsored event. We find
the distinction significant.

16

the publication of an ad book is not pegged to a particular event,

a court must assay the activities which collectively comprise the

business, and look to the overall time frame in which they

occurred. For present purposes, that means the time frame in which

the Association solicited, sold, and published advertising. See

Treas. Reg. S 1.513-1(b) (noting that the activities of soliciting,

selling, and publishing advertising collectively constitute a

business). Those activities persisted for approximately 46 weeks

a year. See Tax Ct. Op. at 593. This is more than sufficient

regularity by any standard.

The Association next argues that it did not regularly

engage in a business because it did not carry on the advertising

activity with the same entrepreneurial zeal that might typify a

commercial operator. But this is an ill-conceived comparison.

Although the purpose behind the unrelated business income tax is to

create a more level playing field between taxed and tax-exempt

enterprises, competitive similarities are not the only factors to

be taken into account. See FOP, 833 F.2d at 722-23. The

applicable regulation stipulates that the activity in question must

be judged "in light of the purpose" of the tax, but it does not

require that either actual competition or competitive equality be

To be sure, the Association argues that the time frame is much
shorter because, although solicitation and sales transpired 46
weeks a year, publication occurred within a very narrow temporal
window. This argument is disingenuous. Treas. Reg. S 1.513-1(b)
refers to the activities of soliciting, selling, and publishing
advertising as a singular business. That business must be
regularly carried on, but there is no requirement that each task
within the scope of the business must be carried on regularly.

17

shown. Treas. Reg. S 1.513-1(c)(1).

In this instance, the Association carried on its

activities in a systematic and well-organized fashion, with a

clearly defined profit motive. Given the limitations of clear-

error review, we cannot disturb the lower court's finding that the

Association's activities were sufficiently regular to bring them

within the ambit of the regulation. See Tax Ct. Op. at 593.

IV. CONCLUSION

We need go no further. While the Association makes

several other arguments, none requires discussion; each of them is

either adequately treated in the Tax Court's opinion, or obviously

incorrect, or both. It suffices to say that the Commissioner's

determination of the tax due and owing rests on a sturdy factual

and legal foundation.

Affirmed.

18