**DISABLED AMERICAN VETERANS,**
**Petitioner–Appellee,**

v.

**COMMISSIONER OF INTERNAL**
**REVENUE, Respondent–**
**Appellant.**

No. 90–1841.

United States Court of Appeals,
Sixth Circuit.

Argued April 2, 1991.

Decided July 5, 1991.

Rehearing Denied Sept. 30, 1991.

Donald C. Alexander (argued), Michael Quigley, Kurt C. Swainston, Cadwalader, Wickersham & Taft, Washington, D.C., for petitioner-appellee.

Abraham N.M. Shashy, Jr., Chief Counsel, I.R.S., Office of Chief Counsel, Gary R. Allen, Acting Chief, David M. Moore, Kenneth L. Greene (argued), Shirley D. Peterson, U.S. Dept. of Justice, Appellate Section Tax Div., Washington, D.C., for respondent-appellant.

Before MARTIN and GUY, Circuit Judges, and LIVELY, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

The Commissioner of Internal Revenue (CIR) appeals an adverse judgment of the United States Tax Court, finding that Disabled American Veterans (DAV), a tax-exempt organization, did not have tax deficiencies over the ten-year period, 1974–85.

CIR raises two issues on appeal: whether monies received by DAV from other organizations for the use of names from DAV's donor list are excludable from unrelated business taxable income (UBTI) as royalties, pursuant to 26 U.S.C. § 512(b)(2); and whether the Tax Court correctly rejected the Commissioner's argument that collateral estoppel precludes DAV from presenting its case. We find that the Tax Court was collaterally estopped from considering this issue, and we reverse its decision for this reason.

I.

The facts in this case are not in dispute. DAV is a corporation, chartered by an Act of Congress in 1932, and exempt from federal income tax as a "social welfare organization" under § 501(c)(4) of the Tax Code.[1] The primary purpose of the organization is to aid and assist wartime disabled veterans and their widows and dependents. DAV's principal source of revenue is donations it receives from the public, made almost entirely in response to direct mail solicitations.

During the years at issue—1974 through 1985—excepting 1976, DAV received a total of $279,862,262 in direct mail contributions. This was divided as follows:

| | |
|---|---|
| 1974 | $ 20,449,412 |
| 1975 | 20,036,437 |
| 1977 | 20,693,711 |
| 1978 | 20,460,662 |
| 1979 | 21,321,348 |
| 1980 | 23,984,143 |
| 1981 | 24,457,036 |
| 1982 | 26,496,183 |
| 1983 | 31,778,546 |
| 1984 | 33,405,956 |
| 1985 | 36,778,828 |
| TOTAL | $279,862,262 |

DAV maintained its donor list in computerized form, which allowed it to solicit from prior contributors and to direct its mailings to individual donors by identifying them in terms of their zip codes, the amount of their contributions, the date of their latest contributions and other ways significant to a solicitor of charitable contributions. In addition, this type of record-keeping allowed DAV to reduce its fundraising costs, both through complying with the bulk mail rates of the post office and through DAV's ability to purge names which did not justify additional mailings. This mailing list maintenance also helped DAV abide by state regulation of charities, as well as Better Business Bureau and National Charities Information Bureau guidelines. Between 15 and 18 percent of the names for DAV's donor list were purged each year as a result of death, unrecorded changes in address, or failures to contribute.

During the years in question, DAV, in keeping with a practice it had started in 1960, permitted exempt, commercial, and fund-raising organizations to use names from its mailing list for their own fund-raising purposes. It received a fee for this use. DAV also exchanged its lists for the lists of other organizations, submitting potential new lists to stringent testing and evaluation in which 10,000 to 50,000 names were randomly selected from the prospective list and sent sample mailings.

DAV's sale of names, accompanied by the permission for a one-time mailing, is

---

1. All section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, unless otherwise indicated.

described as a "list rental," a "rental," a "list reproduction," or a "list use." Both parties agree that the terms "rent" and "rental" are ones commonly used in the industry and have no factual or legal significance relating to the determination of whether petitioner's receipts from such transactions were "royalties" or "rents" within the meaning of the Tax Code.

DAV's "list rental activity" was a continuous, ongoing activity, to which it devoted what amounted to two full-time positions each year. DAV did not utilize volunteers or other unpaid workers in this activity. The organization entered into transactions directly with list users or through list brokers (professional marketers whose business it was to facilitate list rental transactions). Its "rental" information was printed on "rate cards." DAV sent its rate cards to mailing list brokers with whom DAV previously had dealings, and listed its rates in the Standard Rates and Data Service, a directory of mailing lists. DAV was also a member of the Direct Mail Marketing Association, a trade association composed of organizations using direct mail techniques in their operations. Officials of DAV regularly attended meetings and conventions of organizations involved in direct mailing efforts.

DAV delivered the rented list to the list user on magnetic tape or on a variety of preprinted labels, such as heat transfer, gummed, or Cheshire labels. DAV allowed list users to order selected segments of its donor list. For example, a list user could request a segment based on amount of donation, recency of donation, multiple donors, new donors, or zip codes. DAV would not engage in a rental that involved less than 10,000 names.

DAV, like other list owners, imposed conditions on the use of the names from its donor list. It retained the right to approve the dates a list user intended to mail materials, to examine and approve the materials to be mailed by the list user, and to require the removal of any reference to DAV in the materials mailed. DAV inserted "dummy" names in the rented list (i.e., names of people connected with DAV) in order to monitor the use of the names it rented to list users. DAV's National Finance Committee was responsible for review and approval of any proposed list user and of the acceptability of the mailing piece. A list rental would be approved only upon a majority vote of the members of the Committee. Occasionally DAV declined to "rent" or "exchange" segments of the DAV mailing list.

DAV set its rates in accordance with what other organizations were charging DAV for the use of names from their lists. The rates charged to other exempt and fund-raising organizations were higher than those charged to commercial organizations. During the years at issue, DAV's rates ranged from $20 to $45 per 1,000 names for commercial list users, and from $26 to $50 per 1,000 names for exempt and fund-raising list users. DAV increased its rates from $2 to $7 per 1,000 names for lists that were segmented as to amount of contribution, and from $1 to $6 for lists that were based on multiple donors, recent donors, and zip codes, and for names on heat transfer labels rather than magnetic tape.

From 1974 through 1979, DAV entered into transactions with 75 different list brokers, and rented portions of its donor list in 451 separate transactions. In each of the years 1980 through 1985, DAV entered into transactions with numerous list users. In 1984, for example, DAV provided list users with over 53 million names. DAV prepared a "journal voucher" to record income and expenses on a monthly basis. Each of the journal vouchers explained that its purpose was "to record billings applicable to rental of names and addresses for the month of _____." DAV's income from its list rental activity during the years at issue was as follows:

| | |
|---|---:|
| 1974 | $ 1,301,971 |
| 1975 | 1,205,313 |
| 1977 | 1,025,727 |
| 1978 | 1,073,186 |
| 1979 | 1,237,108 |
| 1980 | 1,267,422 |
| 1981 | 1,285,408 |
| 1982 | 1,566,050 |
| 1983 | 1,956,883 |
| 1984 | 2,246,875 |
| 1985 | 2,038,441 |
| TOTAL | $ 16,204,384 |

The Commissioner determined that the income DAV received from the sale of its lists, or portions thereof, during the years in question constituted UBTI and was therefore taxable. The income generated from the use of the mailing lists during these years totalled $16,204,384, with the claimed tax deficiency per year as follows:

| Year | Deficiency |
|------|-----------|
| 1974 | $347,594 |
| 1975 | 316,287 |
| 1977 | 228,335 |
| 1978 | 253,155 |
| 1979 | 324,387 |
| 1980 | 324,213 |
| 1981 | 278,851 |
| 1982 | 346,397 |
| 1983 | 455,566 |
| 1984 | 598,530 |
| 1985 | 626,338 |

With respect to its 1974, 1975, and 1977 tax years, DAV filed an Exempt Organization Business Income Tax Return, Form 990–T, and did not report the payments it received from its list rental business as unrelated business taxable income on those returns. For the 1978 through 1985 tax years, DAV did not file any Forms 990–T or otherwise report as income the payments it received.

In an earlier case, *Disabled American Veterans v. United States*, 227 Ct.Cl. 474, 650 F.2d 1178 (1981) (*DAV1*), the same two parties represented here, litigated the issue of DAV's failure to pay taxes on income received for the use of its mailing list for the years 1970 through 1973. The court found that revenue produced from DAV's activity not only constituted UBTI, but also did not qualify as royalties under section 512(b)(2).[2] It therefore held that DAV had to pay taxes on the amounts received.

In the current case, the Tax Court determined that the Court of Claims in *DAV1* was wrong in its legal analysis and that payments for the use of the list constituted

royalties and therefore the revenue received by DAV was not taxable. It also determined that it had the power to revisit the issue because of what it said was a change in the legal climate surrounding the issue. The Commissioner brings this appeal, arguing that the Tax Court was in error because DAV was collaterally estopped from relitigating the same issue decided in *DAV1*, and, in the alternative, that the Tax Court erred in holding that payments received by DAV for the use of names from its donor list are "royalties" within the meaning of section 512(b)(2) of the Tax Code.

## II.

■ The government argues that *DAV1* controls the only issue in this case, i.e., whether the payments DAV received are "royalties" that are excluded from UBTI. We agree. *DAV1* held:

> DAV's list rentals are the product of extensive business activity by DAV and do not fit within the types of "passive" income set forth in section 512(b). The "royalties" there referenced are those which constitute passive income, such as the compensation paid by a licensee to the licenser for the use of the licenser's patented invention.... For the same reason that personal property rentals constituting unrelated business income are taxable, it is concluded that DAV's receipts from the rental of its mailing list cannot be classified as "royalties" as that term is used in section 512(b)(2) of the code. Rather, DAV's list rental income constitutes UBTI pursuant to sections 511–13 of the code.

*Disabled American Veterans v. United States*, 650 F.2d at 1189–90 (citations omitted).[3]

In a case of this nature, collateral estoppel prevents relitigation of issues and "re-

---

**2.** Section 512 of the Code addresses Unrelated Business Taxable Income (UBTI) and lists several exceptions and modifications to the basic rule of taxability. Section 512(b)(2) is one such modification. It states:

> There shall be excluded all royalties (including overriding royalties) whether measured

by production or by gross or taxable income from the property, and all deductions directly connected with such income.

**3.** *DAV1* addressed additional issues which are not before us today. These supplemental issues did not affect the Court of Claims ruling on the "royalties" issue.

lieve[s] the government and the taxpayer of 'redundant litigation of the identical question of the statute's application to the taxpayer's status.' " *Commissioner v. Sunnen*, 333 U.S. 591, 599, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948) (citation omitted). "[W]here two cases involve income taxes in different taxable years, collateral estoppel must be used with its limitations carefully in mind so as to avoid injustice. It must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts *and applicable legal rules remain unchanged.*" *Id.* at 599–600, 68 S.Ct. at 720 (emphasis added).

█ DAV offers several reasons why collateral estoppel should not apply in this instance. First, it suggests that the doctrine of collateral estoppel has narrow applicability in tax cases. While it is true that some courts have suggested that application of issue preclusion should be narrowly limited in tax cases, *see, e.g., Kennedy v. Commissioner*, 876 F.2d 1251, 1257 (6th Cir.1989) (citations omitted), there is no question that the rules of collateral estoppel apply in the field of federal income tax. *See United States v. International Bldg. Co.*, 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182 (1953); *Sunnen*, 333 U.S. at 598, 68 S.Ct. at 719; *Tait v. Western Md. Ry.*, 289 U.S. 620, 624, 53 S.Ct. 706, 707, 77 L.Ed. 1405 (1933) ("We are not persuaded that the operation of the principle of the thing adjudged in tax cases will, as petitioner insists, produce serious inequalities, or result in great confusion; but any adverse consequences in the administration of the law furnishes no sufficient reason for the abandonment of a rule founded in sound policy, to the enforcement of which suitors are in justice entitled."). Moreover, while some courts have held that collateral estoppel should not be applied in tax cases because "perpetuation of an erroneous tax decision over a number of years would prejudice the losing party and violate the policy of tax uniformity among taxpayers[,]" *Anderson, Clayton & Co. v. United States*, 562 F.2d 972, 992 (5th Cir.1977),

*cert. denied*, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978), that situation does not exist here.

DAV also argues that collateral estoppel should not apply in this case because it would contravene an overriding public policy and result in manifest injustice. In this regard, DAV cites this court's ruling in *United States v. Berman*, 884 F.2d 916 (6th Cir.1989), which it argues stands for the proposition that collateral estoppel in tax cases should not be applied when unfairness would result. In *Berman*, however, we concluded that no estoppel occurred because the litigant against whom estoppel was sought lacked an incentive to adequately litigate the issue in the first proceeding. That clearly has not occurred here, and *Berman* is therefore inapposite.

DAV places its heaviest reliance on the argument, adopted by the Tax Court, that there has been a significant legal development in this area of the law since the ruling in *DAV1.* In *Sunnen*, the Supreme Court stated that if there is a sufficient "change [in] the legal atmosphere," collateral estoppel will not apply. *Sunnen*, 333 U.S. at 600, 68 S.Ct. at 720. The Supreme Court elaborated in *Montana v. United States*, 440 U.S. 147, 161, 99 S.Ct. 970, 977, 59 L.Ed.2d 210 (1979), in which it said that collateral estoppel operated "unless there have been major changes in the law[.]" The types of events which might result in a sufficient change to bar the application of the doctrine include "a [state] judicial declaration intervening between the two proceedings ... a modification or growth in legal principles as enunciated in intervening decisions of this Court ... [or] an interposed alteration in the pertinent statutory provisions or Treasury regulations can make the use of that rule unwarranted." *Sunnen*, 333 U.S. at 600–01, 68 S.Ct. at 720–21. DAV cites several decisions in which courts recognized that a change in legal climate may be caused by an administrative determination of an agency which is empowered to interpret and apply its enabling legislation. *See Graphic Communications Int'l Union, Local 554 v. Salem–Gravure*, 843 F.2d 1490, 1493 (D.C.Cir.1988), *cert. denied*, 489 U.S. 1011,

109 S.Ct. 1119, 103 L.Ed.2d 182 (1989); *Brock v. Williams Enter.*, 832 F.2d 567, 574 (11th Cir.1987). In these cases, however, the administrative change was an *express* overruling of a prior position.

In the instant case, DAV contends that a change in the legal climate occurred as a result of Revenue Ruling 81–178, which was issued by the Commissioner two months after the decision in *DAV1.* Rev. Rul. 81–178, 1981–2 C.B. 135. Revenue Ruling 81–178 discussed a situation in which an exempt organization of professional athletes solicited and negotiated licensing agreements with various businesses authorizing the businesses to use the taxpayer's trademarks, trade names, service marks, copyrights, and members' names, photographs, likenesses, and facsimile signatures in connection with the advertising and sale of merchandise or services offered by the business. The taxpayer had the right to approve the quality and type of the licensed products or services, and the businesses agreed to refrain from engaging in any activity that would adversely affect the reputation of the taxpayer. In discussing the distinction between royalties and rents, the Commissioner stated:

> To be a royalty, a payment must relate to the use of a valuable right. Payments for the use of trademarks, trade names, service marks, or copyrights, whether or not payment is based on the use made of such property, are ordinarily classified as royalties for federal tax purposes. Similarly, payments for the use of a professional athlete's name, photograph, likeness, or facsimile signature are ordinarily characterized as royalties. On the other hand, royalties do not include payments for personal services.

Rev.Rul. 81–178 at 252 (citations omitted). After concluding that this activity was income from an unrelated trade or business, the Commissioner stated:

> [S]ince the payments are for the use of the organization's trademarks, trade names, service marks, copyrights, and its members' names, photographs, likenesses, and facsimile signatures such pay-

ments are royalties within the meaning of section 512(b)(2).

*Id.* The ruling also distinguished a situation in which the agreements with the businesses were concerned solely with endorsing the products and required personal appearances by members of the organization in connection with the endorsed products. In that situation, the ruling stated that the payments would not be non-taxable royalties but, rather, taxable income. *Id.* at 252–53.

In the case before us, the Tax Court agreed with DAV that Revenue Ruling 81–178 "casts doubt on the soundness of the analysis that only income from passive sources qualifies as royalties that are excluded from UBTI, which suggests the appropriateness of our consideration of the issue in this case." It found that the Revenue Ruling stated legal principles to be used in interpreting "royalties" for purposes of section 512(b)(2), which were not discussed in the Court of Claims' analysis and, therefore, allows relitigation of this issue. We disagree.

We leave open the question as to whether a revenue ruling ever effects a significant enough change in the "legal climate" to bar collateral estoppel because we find that, even if such a ruling could result in such a change, Revenue Ruling 81–178 in this case did not.

█ As DAV acknowledges, revenue rulings are not binding upon courts. Nor do they even have the force of Treasury regulations. "Interpretive regulations are not law, they are simply the interpretation of statutes previously enacted." *Caterpillar Tractor Co. v. United States,* 218 Ct.Cl. 517, 589 F.2d 1040, 1043 (1978). These rulings *may* be binding upon the Commissioner in the absence of withdrawal, modification, or revocation. *See, e.g., Silco, Inc. v. United States,* 779 F.2d 282, 287 (5th Cir.1986). Their precedential effect "may be invoked by any taxpayer as if it were issued to him personally and, *to the extent that it addresses issues in his case* the ruling will normally be dispositive." *Beneficial Found., Inc. v. United States,* 8 Cl.

Ct. 639, 645 (1985) (citations and footnotes omitted, emphasis added).

Revenue Ruling 81–178 addresses the specific question of the use of trade dress of the particular athletic organization involved and only generally directs itself to the broader issue of royalties. More importantly, the ruling did not offer new or additional guidance in the interpretation of the law relating to whether the royalty exception to section 512 is available only for passive income.[4] In fact, there is no indication in the revenue ruling itself that the Commissioner ever had any intent to abandon the prior judicial interpretation that royalties for the purpose of section 512(b)(2) be passive in nature.[5] Rather, the ruling is simply a conclusion from a specific set of facts that payments received for the use of *those* intangible assets are "ordinarily" considered royalties. Nothing in the ruling indicates either that they *must* be royalties or that the ruling would apply if a different set of assets was at issue. Whether revenues received from the use of a donor list could ever be royalties is itself highly questionable. As Judge Swift suggested in his dissent from the Tax Court opinion: "The transactions before us look more like one-time rentals of information in exchange for fixed rental income than licenses over a period of time of intangible

property rights in exchange for royalty income."

Other decisions issued since Revenue Ruling 81–178 also indicate that the ruling does not represent a change in the legal climate on the passivity requirement issue. In *NCAA v. Commissioner of Internal Revenue*, 92 T.C. 456 (1989), *rev'd on other grounds*, 914 F.2d 1417 (10th Cir.1990), the Tax Court concluded that income from sales of advertisements published in programs from the NCAA basketball championship tournament was unrelated business income and was not a royalty, and therefore was taxable under sections 511–13. The court cited the Claims Court's finding in *DAV1* that the income was not passive and therefore not a royalty.[6] In response to the argument that Revenue Ruling 81–178 supported a different interpretation, the Tax Court stated in *NCAA* that "Rev. Rul. 81–178 is merely respondent's interpretation of certain sections and regulations and is not binding upon us." [7]

In addition to the ruling in *NCAA*, several other courts have followed the holding in *DAV1*. In *Illinois State Troopers v. CIR*, 833 F.2d 717 (7th Cir.1987), the Seventh Circuit held the sale of space for business listings in a magazine published by a tax-exempt organization did not constitute pas-

**4.** The government's second contention on appeal is that the Tax Court was in error because section 512(b)(2) excludes from UBTI only those royalties that are "passive" in nature and, it contends, DAV's income was actively generated. DAV responds that the distinction is an artificial one and, if it is applied, the evidence demonstrates its list-selling was "passive." Because we find that DAV was collaterally estopped from litigating this matter, we need not reach the merits of this issue. We nevertheless note that in *DAV1* the Court of Claims reached its determination that the income generated was taxable, precisely because it was not the type of royalty "which constitute[d] passive income[.]" *DAV1*, 650 F.2d at 1189.

**5.** DAV attempts to support its argument that the Commissioner rejected the passivity requirement in Revenue Ruling 81–178 by references to two General Counsel Memoranda concerning the creation of that ruling. Such informal, unpublished opinions of attorneys within the IRS are of no precedential value, and we are not prepared to rest a specific interpretation of a

law passed by Congress on what may be nothing more than the general considerations of these government employees. If it truly had been the intent of the Commissioner to change the interpretation of the passivity requirement, we believe *he would have included such guidance in his ruling*.

**6.** In reversing this decision, the Tenth Circuit determined that the advertising revenue was not unrelated business taxable income and therefore the court had no "need to consider whether the income should nonetheless be excluded from taxation as royalty under I.R.C. § 512(b)(2)." *NCAA*, 914 F.2d at 1418 n. 2.

**7.** DAV also suggests that the cases cited by the Commissioner in Revenue Ruling 81–178 stand for the principle that there is a distinction between a payment for the use of an intangible asset and the activity which gave rise to the value of such asset. We disagree. Each of these decisions was available to the Court of Claims when it ruled in *DAV1* as well as to other courts when they ruled on this issue and none of them so interpreted these decisions.

sive income "such as the compensation paid by a licensee to the licensor for the use of the licensor's patented invention." *Id.* at 723 (citing *DAV1*, 650 F.2d at 1189).

Similarly, in *National Water Well Association v. Commissioner*, 92 T.C. 75 (1989), the Tax Court held that the income in question, dividends from an insurance program for the members of the tax-exempt trade association, were not royalties but compensation for services. Further, it stated that where the income in question is not passive income to the tax-exempt organization the royalty exception does not apply. "The income petitioners received was not passive income but more akin to compensation for services rendered and so was not royalty income." *Id.* at 101.

The Tax Court distinguishes these holdings in the instant case by stating that, in each of these instances, the taxpayers received revenues derived from advertising or for compensation for services, not for use of an intangible object. In our view, however, the sale of the "tangible" mailing list, which was maintained and kept up to date by DAV, comes very close to the activities discussed in the subsequent cases. We find that the Tax Court simply has substituted its own analysis for that of the Court of Claims. Judge Swift, joined by three other judges, expressed this point cogently in his dissenting opinion, by stating:

> Unless we are prepared to overrule the controlling authority of this and other courts on this issue, the well-established principles of stare decisis and collateral estoppel are directly applicable and require us to follow the above-referenced substantial authority and to hold for respondent.

It requires more than mere belief that a case was wrongly decided to avoid the application of the collateral estoppel doctrine. Although adoption of new statutory provisions or new administrative regulations that clearly change the basic legal rules may allow a party to escape the bar

of collateral estoppel, "the exception is not available merely because the defeated party wishes to reargue the law." 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4425 (1981). DAV's remedy lay either through the appeals process or with the legislature. In this regard, Congress has already taken action on this matter and passed legislation that would allow revenue received from *other tax exempt organizations* for the use of donor mailings lists to be excluded as royalties pursuant to section 512(b)(2).[8] We view this limited relief afforded by Congress to be inconsistent with the view of the law urged by DAV.

REVERSED.

BOYCE F. MARTIN, Jr., Circuit Judge, concurring.

While I agree with the result reached by the majority, I disagree with the application of collateral estoppel to the facts of this case. I respectfully disagree with the majority's conclusion that Revenue Ruling 81–178 did not significantly change the legal climate with respect to the interpretation of "royalty" for purposes of section 512(b)(2) of the Internal Revenue Code.

In *DAV1*, the court of claims laconically stated that "DAV's list rentals are the product of extensive business activity by DAV and do not fit within the types of 'passive' income set forth in section 512(b)." 650 F.2d at 1189. The court of claims' opinion does not provide any further analysis of the issue other than noting that "[t]he 'royalties' there referenced are those which constitutes passive income, such as the compensation paid by a licenser for the use of the licenser's patented invention." *Id.* A fair reading of *DAV1* suggests the court rested its conclusion solely on the fact that DAV's list rentals were not "passively" generated. In Rev.Rul. 81–178, however, the Commissioner rejects this passive versus active test in determining what was to be considered a royalty for purposes of section 512(b)(2). Instead,

---

8. The parties spend a significant amount of time discussing the legislative history of this new law. Because we find that DAV was collaterally estopped from bringing this action, we need not enter this discussion.

Rev.Rul. 81–178 focused solely upon whether the payment related to the use of a valuable right.

The majority reads Rev.Rul. 81–178 as nothing more than "a conclusion from a specific set of facts that payments received for the use of *those* intangible assets are 'ordinarily' considered royalties." The significance of Rev.Rul. 81–178, however, does not lie in its factual similarity to the present case, but rather in its analysis of what is properly considered a royalty. Indeed, all cases, in their simplest terms, are nothing more than conclusions based upon a specific set of facts, with their relevance primarily stemming from the principles they employ and help to establish. There is no question, at least in my mind, that Rev.Rul. 81–178 utilized an entirely different mode of analysis in reaching its conclusion than did the court of claims in *DAV1*, and furthermore, that the analysis employed in Rev.Ruling 81–178 is directly applicable to the issue before us.

Needless to say, I also believe that Rev. Rul. 81–128 did carry enough force in order to evidence a change in the "legal climate" sufficient to preclude the application of collateral estoppel. In my opinion, this case is not unlike those cases in which courts have recognized that a change in legal climate may be caused by an administrative agency which is empowered to interpret and apply its enabling legislation. *See Graphic Communications Int'l Union, Local 554 v. Salem–Gravure,* 843 F.2d 1490, 1493 (D.C.Cir.1988), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1119, 103 L.Ed.2d 182 (1989); *Brock v. Williams Enter.,* 832 F.2d 567, 574 (11th Cir.1987). Although revenue rulings are not binding upon courts, they are binding upon the Commissioner in the absence of withdrawal, modification, or revocation. *Silco, Inc. v. United States,* 779 F.2d 282, 287 (5th Cir.1986).

Notwithstanding my opinion that the application of collateral estoppel is inappropriate in this case, I would nevertheless reach the same conclusion as did the majority of reversing the decision of the tax court. This exceedingly complex case centers around a single inauspicious question: Are the monies received by DAV for the use of its donor list by other organizations properly classified as royalties pursuant to 26 U.S.C. § 512(b)(2). Unfortunately, the term "royalties" is not defined in any precise manner for purposes of § 512(b)(2) in the Code. We thus must look to other evidence in order to determine what Congress meant. Should the term "royalties" encompass the income DAV receives for the use of its donor list or not?

This question appears to have been conclusively answered by Congress when it enacted section 513(h) in 1986. Section 513(h) specifically excludes payments to an exempt organization from another exempt organization for list rentals. Thus the income is non-taxable unrelated business income. 26 U.S.C. § 513(h). The legislative history of section 513(h) indicates that Congress was responding to the court of claims decision in *DAV1* in enacting this section. *See* H.R.Conf.Rep. No. 841, 99th Cong., 2d Sess., pt. 2, at 822 (1986), *reprinted in* 1986–3 (vol. 4) C.B. 822, U.S.Code Cong. & Admin.News 1986, 4075, 4910. Congress, in enacting this section, obviously felt that the court of claims decision in *DAV1* was the proper interpretation of "royalties" for purposes of § 512(b)(2) with respect to the payments received by an exempt organizations from a commercial organization. Why else would Congress have written § 513(h) to apply only to exempt organizations if it had disagreed with court of claims' interpretation of the term "royalties" in § 512(b)(2)?

The acceptance of DAV's position that the monies it receives from list rental are royalties under § 512(b)(2) would totally eviscerate section 513(h). Section 513(h) would be reduced to mere surplusage under DAV's interpretation of § 512(b)(2) which would hold that all list rentals, and not just those to other exempt organizations, are excludable from unrelated business taxable income. Although § 513(h) was enacted after the relevant time period at issue in this case, its implications cannot be ignored. Once Congress has made its intentions clear, I think we should try to carry out those intentions. I do not think this issue is still open for debate. There is

simply no way to reconcile Congress' intent as evidenced by the enactment of § 513(h) and the position advanced by DAV. I would reverse the decision of the tax court and find that the monies received by DAV from list rentals are not excludable from unrelated business taxable income as royalties under § 512(b)(2).