T.C. Memo. 1999-206


UNITED STATES TAX COURT


PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent[1]


Docket No. 13922-97.                    Filed June 22, 1999.


<u>Albert G. Lauber, Jr.</u>, <u>Milton Cerny</u>, <u>Lloyd H. Mayer</u>,

<u>Julie W. Davis</u>, and <u>Carl S. Kravitz</u>, for petitioner.

<u>Dianne I. Crosby</u> and <u>Bettie N. Ricca</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined deficiencies in

petitioner's Federal income taxes as follows:

| Year | Deficiency |
|------|-----------|
| 1991 | $51,441 |
| 1992 | 33,549 |

---

[1]     This case was consolidated, for trial purposes only, with
<u>Common Cause v. Commissioner</u>, 112 T.C. ___ (1999), in which an
opinion is also being issued today.

1993          49,210

Unless otherwise indicated all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues presented by the parties include:  (1) Whether, for purposes of the unrelated business income tax provisions of section 511, petitioner is carrying on a list rental business that is not substantially related to its exempt purpose; (2) if so, whether the list brokers, list managers, and computer house used by petitioner are agents of petitioner for the purpose of carrying on such a business; and (3) whether the mailer's list rental payments are royalties that are excluded from unrelated business taxable income pursuant to section 512(b)(2).

## FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated for trial pursuant to Rule 91.  The parties' stipulations of fact are incorporated herein by reference and are found as facts in the instant case.

Petitioner is a corporation with its principal office in New York, New York.

Petitioner is exempt from Federal income tax as an organization described in section 501(c)(3).  Petitioner was formed for the purpose of assuring quality reproductive health care for women.  Petitioner maintains a list of names and

addresses of its members, donors, and other supporters (collectively supporters) to whom it regularly sends mail (master list).  The master list also contains other information about the supporters, including their gender and the frequency, recency, and amount of contributions that each supporter has made to petitioner.  Petitioner communicates by direct mail with its supporters.

The master list is kept on large computerized databases that petitioner regularly maintains and updates.  Because it is very valuable, petitioner builds its master list by acquiring new names and addresses and guards its master list against misuse.

From the master list, petitioner creates another list that contains names, addresses, and other limited information about a segment of petitioner's supporters (rental list).  Petitioner's master and rental lists are intangibles in which petitioner has ownership rights.  Petitioner's master and rental lists are valuable because they are collections of names and addresses of people with similar characteristics such as willingness to respond to solicitations received by mail and interest in supporting certain types of tax-exempt organizations.  Petitioner makes its rental list available for rent or exchange with other organizations.

The direct mail and mailing list industry has its own industry standards and trade practices.  In structuring its list rental transactions, petitioner abides by the trade practices of

the mailing list industry and arranges its transactions roughly on the same terms and conditions that are standard in the industry.

In a list rental transaction, the party (mailer) seeking to send mail to the individuals or entities named on a list (mailing list) pays the owner of the mailing list (list owner or owner) for the one-time right to send mail to the named individuals or entities. If any of the named individuals or entities to which the mailer has mailed responds to the mailing, the mailer then "owns" that name and can continue to send that named individual or entity additional mail. If the named individual or entity does not respond to the one-time mailing, the mailer may not directly send mail to that named individual or entity again. List owners "seed" their mailing lists with names and addresses of their employees or of the employees of their list managers to make sure that such unauthorized mailings do not occur.

Petitioner's rental list is stored at Triplex Direct Marketing Corp. (Triplex), a professional computer service business that stores and maintains computer databases for mailing lists. From petitioner's rental list, Triplex produces a copy on labels or magnetic tape for mailers. Although petitioner has used Triplex's services since the early 1980's, a written contract between petitioner and Triplex does not exist. Triplex corresponds with petitioner regarding the fees it charges for

computer services.  Triplex provides similar services to both nonprofit and commercial entities on the same terms.

Petitioner retains Craver, Mathews, Smith, & Company, Inc. (CMS), to assist it in raising funds and building its master and rental lists.  Petitioner first contracted with CMS for list management services during the 1980's.  Petitioner renewed its contract with CMS on December 17, 1990, October 7, 1992, and February 4, 1993.[2]  As petitioner's list manager, CMS determines the overall management strategy and supervises all list rental transactions involving petitioner's rental list.

CMS retains the services of other list managers to handle the details of the list rental transactions.  Before August 1993, CMS retained the services of Names in the News (Names), a professional list manager and list broker that regularly handles both nonprofit and commercial mailing lists.  On July 23, 1993, CMS communicated with petitioner regarding its choice of American List Counsel, Inc. (ALC), as list manager for future list rental transactions.  After August 1993, CMS retained the services of

---

[2]     Petitioner renewed its contract with CMS sometime between August 1993 and February 1995.  The contract provides that it is effective beginning August 1993, which is within the period in issue in the instant case.  Petitioner contends, however, that the terms of the contract were not agreed upon until February 1995, which is after the period in issue in the instant case, and petitioner argues that the terms of this contract therefore are not relevant to the instant case.  We find that the date the contract became binding is irrelevant because after August 1993 the rental transactions involving petitioner's rental list were actually arranged in accordance with the terms of the contract.

ALC as petitioner's list manager.  The list manager[3] is responsible for the day-to-day activities regarding petitioner's rental list.  The list manager promotes list rental transactions involving petitioner's rental list via distribution of data cards (printed cards providing basic information as to price per thousand and all other list rental information for a given list), solicitations, and personal sales calls directed at list brokers and potential customers.  The list manager advertises petitioner's rental list in the same places as exempt and nonexempt entities advertise their lists. The list manager pays all costs of promoting and marketing petitioner's rental list and does not charge petitioner additional fees for such services.

CMS reviews the data cards, advertisements, and promotional materials used by the list manager.  Petitioner also reviews all data cards, advertisements, and promotional materials used by the list manager in connection with petitioner's rental list.

No written contract exists between petitioner and the list manager.  However, the form language on Names' list orders during 1991 and 1992 states:  "We will bill mailer on behalf of list owner; payment (less commission) will be made upon receipt of payment from the mailer.  We act only as agent for the list owner

---

[3]     For the most part, Names and ALC conducted transactions involving petitioner's rental list in the same manner.  To that extent, we will refer to them as the list manager for the remainder of this opinion.  To the extent that there are differences in any particular rental transaction during the period that either Names or ALC was petitioner's list manager, we will refer to the respective list manager individually.

in these transactions."  During 1993, Names changed that language to state:  "We will bill mailer on behalf of list owner; payment (less commission) will be made upon receipt of payment from the mailer.  We act only as agent for the list owner or the mailer in these transactions."

The list manager can also act for the mailer as a list broker.  The activities of a list broker include:  (1) Searching advertisements and databases for appropriate list offerings for the mailer to rent, (2) coordinating the rental transaction on behalf of the mailer, (3) collecting payment from the mailer to remit to the list manager or list owner, and (4) analyzing the results of the mailing to determine whether it was successful. The same list broker does not participate in every transaction. Rather, each mailer chooses its own list broker to act on its behalf.

In a typical list rental transaction involving petitioner's rental list, the mailer contacts the list manager either directly or through a list broker and submits a proposed list rental order.  If any mailer, other than petitioner's affiliates, contacts petitioner directly, petitioner refers that mailer to the list manager.  Along with the list order, the mailer indicates the time of the mailing and encloses a copy of the materials to be sent.  The list manager forwards the order to CMS for approval.  CMS reviews the proposed mailing pursuant to guidelines that petitioner provides and either approves or denies

the list order.  Occasionally, CMS forwards the list order to petitioner for final approval.

Upon receiving approval, the list manager arranges with Triplex to fill the order.  Triplex produces a copy of the rental list according to the mailer's specifications and sends it to the mailer's mail house.

Petitioner divides its rental list into specific segments based on the recency of the donors' contributions.  Pursuant to the recommendations of the list manager and CMS, petitioner charges a different base price for each segment.  Before August 1993, the base price included a 10-percent list management commission retained by Names, a 15-percent commission retained by CMS, and a 10-percent list brokerage commission retained by either the independent list broker or Names (if the mailer was not using an independent broker).  After August 1993, the base price includes a 25-percent list management commission divided by ALC and CMS[4] and a 20-percent list brokerage commission retained by either the independent list broker or ALC (if the mailer is not using an independent list broker).  The base price also includes a fee of $3.90 (running fee) remitted by the list manager to Triplex to pay for the computer charges incurred in producing the copy of petitioner's rental list.

_____

[4]     The method by which commissions are divided between CMS and ALC is outlined in the contract between CMS and ALC which was produced as evidence in the instant case but was placed under seal at the request of ALC and CMS.

It is standard in the mailing list industry to include the management commission, brokerage commission, and running fees in the base price. The commissions paid to the list manager, CMS, and the list brokers are within the range of usual and customary amounts paid for such services.

For an additional cost, a mailer can further customize its order. For an extra fee per 1,000 names, a mailer can request that the names it rents be selected by certain other criteria. Selection criteria (special selections) include: Gender, ethnicity, State, and ZIP code. Petitioner, pursuant to the recommendation of CMS, determines which special selections to offer and how much to charge the mailer. Petitioner includes the special selection information on its data cards. Triplex actually performs the special selections. Triplex charges different fees for performing different special selections and regularly notifies petitioner of the fees for such selections. Before August 1993, the amount that the mailer was charged for special selection fees was equal to the amount that Triplex charged petitioner and did not include any commissions paid to CMS, the list manager, or the list brokers. After August 1993, the amount that the mailer is charged for special selection fees exceeds the amount which Triplex charges petitioner and includes a 20-percent list brokerage commission and a 25-percent list management commission retained by CMS and ALC.

The mailer also determines the type of media on which it receives petitioner's rental list. For the base price, the mailer receives the rental list printed on Cheshire labels (ungummed labels that are affixed by machine). For an extra fee, the mailer can receive the rental list on pressure-sensitive labels or on magnetic tape. Triplex charges petitioner extra fees for the provision of the rental list on the different media. Before August 1993, petitioner charged the mailer, as media fees, the same amount which Triplex charged petitioner. After August 1993, CMS, with petitioner's approval, set prices for the media fees in excess of the Triplex fees. A mailer determines the way the rental list is shipped, and, depending on the mailer's choice, Triplex charges petitioner a shipping fee. Petitioner charges the mailer a shipping fee equal to the amount that Triplex charges petitioner.

As is standard in the industry, the mailer is billed and payment is collected by the following process. After filling an order, Triplex bills the list manager for the fees associated with filling the order including running, special selection, media, and shipping fees. The list manager then bills the mailer or the mailer's list broker. If the mailer uses an independent list broker, the bill is for the listed base price, plus any special selection, media, and shipping fees, less the list brokerage commission (which was included in the base price). Before it sends the bill to the mailer, the list broker adds its

commission to the bill. The mailer pays the list broker the full price reflected on the bill that the mailer receives. The list broker deducts its commission and remits the remaining payment to the list manager. If the list manager acts as the list broker in the transaction, the bill sent to the mailer includes the full base price (including the list brokerage commission), plus any special selection, media, and shipping fees, and the mailer remits the full payment directly to the list manager.

After receiving payment from the mailer or its list broker, the list manager deducts its commission, pays Triplex its fees, and remits the remainder to CMS. CMS deducts its commission and remits the remainder to petitioner as part of a monthly accounting for all the list rental transactions of the past month. Before August 1993, if a mailer canceled its order, it was required to pay a "processing fee" of $50. The fee was retained by Names.

List rental transactions are carried on continuously. During 1991, 1992, and 1993, petitioner's gross receipts (base price less commissions, Triplex running fees, and other miscellaneous fees) from its list rental transactions were $191,415, $161,273, and $192,185, respectively. For each of the years in issue petitioner timely filed Form 990, Return of Organization Exempt from Income Tax, on which it reported the income it received from its rental list transactions as nontaxable royalty income. Petitioner also timely filed Form

990-T, Exempt Organization Business Income Tax Return, for each of the years in issue.

OPINION

Section 511(a)(1) imposes the unrelated business income tax (UBIT) on the unrelated business taxable income (UBTI) of certain tax-exempt organizations. Section 512 defines UBTI as follows:

SEC. 512. UNRELATED BUSINESS TAXABLE INCOME.

(a) Definition.--For purposes of this title--

(1) General Rule.--Except as otherwise provided in this subsection, the term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business, both computed with the modifications provided in subsection (b).

Accordingly, income is UBTI if it arises from a regularly carried-on trade or business that is not substantially related to the organization's tax-exempt purpose. See sec. 1.513-1(a) Income Tax Regs. Royalties, however, are excluded from UBTI pursuant to section 512(b)(2).[5] See <u>Sierra Club, Inc. v.</u>

_____

[5]    Sec. 512(b) provides:

SEC. 512(b). Modifications.--The modifications referred to in subsection (a) are the following:

*    *    *    *    *    *    *

(2) There shall be excluded all royalties (including overriding royalties) whether measured by

(continued...)

<u>Commissioner</u>, 86 F.3d 1526, 1531 (9th Cir. 1996), affg. T.C. Memo. 1993-199 and revg. on another issue 103 T.C. 307 (1994); <u>Disabled Am. Veterans v. Commissioner</u>, 94 T.C. 60, 76 (1990) (DAV II), revd. on other grounds 942 F.2d 309 (6th Cir. 1991).

Neither the Code nor the regulations define the term "royalty" for UBIT purposes. Instead, section 1.512(b)-1, Income Tax Regs., provides that "Whether a particular item of income falls within any of the modifications provided in section 512(b) shall be determined by all the facts and circumstances of each case." Petitioner bears the burden of proving that the list rental payments are royalties that are excluded from UBTI pursuant to section 512(b)(2). See Rule 142(a).

In the instant case, respondent contends that, in each of the list rental transactions, the mailer's entire payment (including the amounts paid to the list brokers, list manager, CMS, and Triplex) constitutes UBTI to petitioner because petitioner regularly carries on a list rental business that is not substantially related to its exempt purpose. In that regard, respondent contends that the list brokers, list manager, CMS, and Triplex are petitioner's agents for the purpose of carrying on the list rental business. Petitioner disputes respondent's

---

[5](...continued)
            production or by gross or taxable
            income from the property, and all
            deductions directly connected with
            such income.

contentions and, additionally, contends that the mailers'
payments are excluded from UBTI as royalties pursuant to section
512(b)(2).  Before addressing respondent's trade or business and
agency arguments, we address the royalty issue.

In the instant case, the parties accept the definition of a
royalty found in Rev. Rul. 81-178, 1981-2 C.B. 135.[6]
Additionally, the parties agree that petitioner's rental list is
a valuable intangible.  However, the parties disagree as to
whether any portion of the list rental transaction constitutes
compensation for goods and services.  The parties further

_____

[6]     In Rev. Rul. 81-178, 1981-2 C.B. 135, the Internal Revenue
Service sought to clarify the definition of royalty for purposes
of sec. 512(b)(2).  The ruling deals with two different factual
situations.  In the first situation, various businesses pay the
taxpayer, an exempt organization, for the right to use the
taxpayer's symbols and the signatures and likenesses of its
members in promoting their products.  See id.  In the second
situation, the businesses pay the taxpayer in return for its
members' making appearances in endorsement of the businesses'
products.  See id., 1981-2 C.B. at 136.  The ruling provides, in
pertinent part:

> To be a royalty, a payment must relate to the use
> of a valuable right.  Payments for the use of
> trademarks, trade names, service marks, or copyrights,
> whether or not payment is based on the use made of such
> property, are ordinarily classified as royalties for
> federal tax purposes.  * * *  On the other hand,
> royalties do not include payments for personal
> services.  [Id.; citations omitted.]

In the first situation, the ruling concludes that, because the
exempt organization receives payment solely for the use of its
intangibles, the payment is a royalty.  See id.  In the second
situation, the ruling concludes that, because the organization
receives payment for the services of its members in endorsing
products, the payment is not a royalty.  See id.

disagree as to whether the presence of any compensation for goods and services in the list rental payment precludes royalty treatment, pursuant to section 512(b)(2), for any portion of the list rental payment. The issue has been the subject of much litigation. See Disabled Am. Veterans v. United States, 227 Ct. Cl. 474, 650 F.2d 1178 (1981) (DAV I), affd. after remand 704 F.2d 1570 (Fed. Cir. 1983); Disabled Am. Veterans v. Commissioner, supra; Sierra Club, Inc. v. Commissioner, T.C. Memo. 1993-199. We discuss each of those cases in more detail below.

Earlier Cases

Disabled American Veterans

In DAV I, the exempt organization engaged in the rental of its mailing list, but, unlike petitioner, the organization itself performed all of the list management and list fulfillment functions. On the question of whether the list rental payments were royalties, the Court of Claims concluded that the list rentals "[were] the product of extensive business activity by DAV and [did] not fit within the types of 'passive' income set forth in section 512(b)." Disabled Am. Veterans v. United States, 650 F.2d at 1189. The court found that the payments were more akin to rent from the use of personal property than to royalties, and held that the income from the transaction was not excluded from UBTI under section 512(b). See id. at 1189-1190.

In DAV II, the same exempt organization that appeared before the Court of Claims in DAV I appeared before this Court; however, a different taxable year was in issue. Although DAV II involved the same parties and legal issues as DAV I, we concluded that the issuance of Rev. Rul. 81-178, supra, had changed the legal climate. Consequently, we held that collateral estoppel did not apply. See Disabled Am. Veterans v. Commissioner, supra at 69. Relying on the definition of royalty contained in Rev. Rul. 81-178, supra, we concluded that there is no distinction between active and passive royalties for section 512(b)(2) purposes. See Disabled Am. Veterans v. Commissioner, supra at 75. We also made it clear that we could distinguish payments for the use of an intangible, which constitute a royalty from payments for advertising, compensation for services, or other profits masquerading as royalties. See id. at 77. The Court of Appeals for the Sixth Circuit, reversing the decision of this Court, held that the issuance of Rev. Rul. 81-178, supra, was not a sufficient change of legal climate to preclude collateral estoppel. See Disabled Am. Veterans v. Commissioner, 942 F.2d at 314.

### Sierra Club

The issue of whether income from a mailing list transaction is UBTI arose again in Sierra Club, Inc. v. Commissioner, T.C. Memo. 1993-199. Unlike the exempt organization in DAV I and DAV II, the exempt organization in Sierra Club did not itself perform

any of the list management or list fulfillment functions. Rather, as in the instant case, a professional list manager performed all list management functions, and a computer house performed all list fulfillment functions. On cross-motions for summary judgment, we held that the payment received by the exempt organization was, at least in part, a royalty. We rejected the Commissioner's argument that royalties, in the context of section 512(b)(2), meant only those earned passively. We also held, however, that an issue of fact existed regarding whether any part of the list rental transaction price, specifically the fees for special selections, media, and shipping, was payment for goods and services.

Before appeal, the parties in Sierra Club settled the issue of whether any part of the list rental payment was for goods or substantial services provided in connection with the rental transactions. See Sierra Club, Inc. v. Commissioner, 103 T.C. at 310. In affirming our decision as to the royalty issue, the Court of Appeals for the Ninth Circuit held that the term "royalty", as it is used in section 512(b)(2), "is by definition 'passive' and thus cannot include compensation for services rendered by the owner of property." Sierra Club, Inc. v. Commissioner, 86 F.3d at 1532. Additionally, the court reasoned that, because the exempt organization did not itself provide any services to the mailer, the entire amount it actually received was a royalty for UBIT purposes. See id. at 1535-1536.

Royalty-Related Activity or Services

In the instant case, we must decide whether any part of the mailing list rental payments constitutes compensation to petitioner for goods or services.[7]  In each mailing list rental transaction, the mailer's rental payment compensates petitioner for the mailer's use of petitioner's list and, also, compensates the list manager, CMS, Triplex, and the list brokers for their participation in the transaction.  Certain of these activities exploit and protect the intangible (i.e., the list).  We have held that the owner of an intangible may engage in certain activities to exploit and protect the intangible which do not change the nature of the payment received.  See Wm. J. Lemp Brewing Co. v. Commissioner, 18 T.C. 586, 596 (1952) (payment to the owner of the intangible was a royalty even though the owner reserved the right to supervise the advertising, marketing, and quality of the product which was to bear the trademarked name); see also Mississippi State Univ. Alumni, Inc. v. Commissioner, T.C. Memo. 1997-397 (review of marketing material and endorsement of an affinity credit card program bearing the name of an exempt organization were not services provided to the card issuing company).  To hold otherwise, it seems to us, "would require us to hold that any activity on the part of the owner of intangible

_____

[7]     This is the same issue that the parties settled in DAV II and Sierra Club and that the courts therefore did not have before them.

property to obtain a royalty, renders the payment for the use of that right UBTI and not a royalty."  Sierra Club, Inc. v. Commissioner, 86 F.3d at 1536.  Accordingly, in the instant case, we carefully scrutinize the activities of each of the parties compensated in the list rental transaction to ascertain whether they are undertaken to exploit or protect petitioner's list. Hereinafter, we refer to activities which are undertaken to exploit or protect the list as royalty-related activities.

The List Manager

In a list rental transaction, the list manager's activities include:  (1) Promoting list rental transactions involving petitioner's rental list via advertising, distribution of data cards, solicitations, and personal sales calls directed at list brokers and potential customers; (2) forwarding the list rental order to CMS for approval; (3) arranging with Triplex to fill the order; (4) billing the mailer or the mailer's list broker; (5) paying Triplex the amounts it is owed; and (6) remitting payment to CMS.

In the context of the list rental transaction, a list owner has certain intangible information regarding the individuals and entities whose names and addresses appear on its list. Specifically, the list owner knows that such individuals and entities are responsive to direct mail and willing to support certain tax-exempt organizations.  To exploit that knowledge, the list owner must first let others know that the list is available.

In the instant case, that is accomplished through the promotional efforts of the list manager. Accordingly, we conclude that the list manager's activities in distributing data cards and other forms of advertising directed to list brokers and potential mailers on petitioner's behalf are royalty-related activities.

Additionally, to protect the value of its mailing list, a list owner will not allow the individuals and entities whose names appear on the list to receive mail that the list owner considers objectionable. Accordingly, the list owner must engage in activities to ensure that the list is rented only to appropriate mailers. Consequently, we conclude that the list manager's activities in forwarding the list orders to CMS for approval are royalty-related activities.

To exploit its intangible and convey it to the user, the list owner must also render it in tangible form. In the list rental context, that is accomplished by producing a copy of the list for the mailer. Consequently, we conclude that, the list manager's activities in forwarding the order to Triplex for fulfillment and obtaining from Triplex a copy of the rental list are royalty-related activities.

Finally, the owner of the intangible is entitled to be paid for its use. Accordingly, we conclude that the list manager's activities in billing the mailer, paying Triplex, and remitting payment to CMS are royalty-related activities. On the basis of

the foregoing, we conclude that all of the activities in which the list manager engages are royalty-related activities.

CMS

The activities of CMS include: (1) Reviewing the data cards, advertisements, and promotional materials used by the list manager; (2) reviewing the proposed mailing pursuant to guidelines that petitioner provides; (3) occasionally forwarding the list order to petitioner for final approval; and (4) remitting payment to petitioner.

As we discussed above, the data cards are the means by which the list manager promotes and advertises petitioner's rental list. Review of promotional and advertising material by the owner of an intangible is not inconsistent with royalty treatment. See Wm. J. Lemp Brewing Co. v. Commissioner, supra; Mississippi State Univ. Alumni, Inc. v. Commissioner, supra. Similarly, as we discussed above, review of all list rental transactions is part of the protection of the list. Finally, as discussed above, the list owner is entitled to be paid. Accordingly, CMS' activities in remitting payment to petitioner are royalty-related activities. Consequently, we conclude that all of the activities in which CMS engages are royalty-related activities.

Petitioner

Petitioner does not directly engage in any significant activities with regard to a rental list transaction. The only activities in which petitioner directly engages are review of the promotional materials and occasional approval of list rental transactions. As we discussed above, such activities are royalty-related activities.

Triplex

Triplex's activities include: (1) Printing a copy of petitioner's list on the medium chosen by the mailer; (2) performing the special selections chosen by the mailer; and (3) shipping the completed order to the mailer.

As we discussed above, producing an intangible in tangible form is necessary for the exploitation of the intangible. Mailers that order petitioner's list on magnetic tape, instead of, for example, on Cheshire labels, still receive only the one-time right to mail to the names and addresses on the rental list. It appears to us that the medium itself is of little or no value to the mailer without the information it contains. Moreover, the provision of the list on various media is also customary within the mailing list industry and consistent with the rental of a mailing list for one-time use only. Accordingly, we conclude that Triplex's activities in printing a copy of petitioner's list

on the medium chosen by the mailer are royalty-related activities.

Special selections are the means by which a mailer further narrows the types of individuals and entities whose names will appear on the list that the mailer orders. Certain mailers may prefer a list consisting of only the names of female donors, while others may prefer only the names of individuals or entities within a specific State or ZIP code. The essence of a mailer's order is the one-time right to use a portion of petitioner's mailing list. We conclude that there is no significant difference between, on the one hand, the rental of a list consisting of all of the names of petitioner's supporters and, on the other hand, the rental of a list consisting of only petitioner's female supporters or, for example,[8] the rental of a list consisting of only the names of petitioner's male supporters between the ages of 20 and 25 who reside in a particular ZIP code. The culling out or special selection of certain names is ancillary to the maintenance and exploitation of the list. Cf. Glen O'Brien Movable Partition Co. v. Commissioner, 70 T.C. 492, 502 (1978) ("Where services are performed subsidiary and ancillary to the transfer of patent rights and proprietary know-how, they take on the nature of the patent rights and know-how as

---

[8]    Petitioner does not offer age as a special selection.

'property'."); <u>Ruge v. Commissioner</u>, 26 T.C. 138, 143 (1956) ("The consulting services * * * were ancillary and subsidiary to the assignments of the inventions").  In other words, payment for the one-time right to mail to names on a list, no matter how specialized that list is, is a royalty.

As to the shipping, in order to exploit the intangible the owner ordinarily will need to send the information contained in the intangible to the user.  Consequently, we conclude that Triplex's activities in shipping the list to the mailer are royalty-related activities.  In sum, we conclude that, in the course of the list rental transaction, all of the activities in which Triplex engages are royalty-related activities.

<u>List Brokers</u>

The activities of the list brokers include:  (1) Searching advertisements and databases for appropriate list offerings for the mailer to rent; (2) coordinating the rental transaction on behalf of the mailer; (3) collecting payment from the mailer to remit to the list manager or list owner; and (4) analyzing the results of the mailing to determine whether it was successful. We conclude that the list brokers' activities are not royalty-related activities.  Rather, the list brokers' activities are provided solely to the mailers and solely for the mailers'

convenience.[9]  Accordingly, we conclude that the list brokers'
activities are services and are not part of the royalty-related
activities.  Consequently, any portion of the mailers' payments
that is to compensate the list brokers for their activities in
the mailing list transaction is not a royalty.

Our inquiry as to the list brokers' services, however, does
not end there.  Because we hold that the portion of the mailers'
payments that is related to the list brokers' activities is not a
royalty, we must address respondent's other arguments that the
list brokers are petitioner's agents for carrying on a list
rental business and that any services they provide and any
portion of the list rental payment received by them for the
rental of petitioner's list should be attributed to petitioner
for purposes of calculating petitioner's UBTI.  Petitioner argues
that the list brokers are independent contractors and that the
services they provide, and any compensation they receive for such
services, should not be attributed to petitioner.

As to whether an agency relationship exists, the manner in
which the parties to an agreement designate their relationship is
not controlling.  See Board of Trade v. Hammond Elevator Co., 198
U.S. 424, 437 (1905).  Rather, the question of agency is based on

---

[9]     As discussed below, this factor is also important in
deciding whether the list brokers are petitioner's agents.

the surrounding facts and circumstances of each case.  See id.
(citing Connecticut Mut. Life Ins. Co. v. Spratley, 172 U.S. 602,
617 (1899)).  "An essential characteristic of an agency
relationship is that the agent acts subject to the principal's
direction and control."  In re Shulman Trans. Enters., Inc., 744
F.2d 293, 295 (2d Cir. 1984).  "[A]n independent contractor can
be an agent if, and to the extent that, the contractor acts for
the benefit of another and under its control in a particular
transaction."  State Police Association v. Commissioner, 125 F.3d
1, 7 (1st Cir. 1997), affg. T.C. Memo. 1996-407; see also
National Collegiate Athletic Association v. Commissioner, 92 T.C.
456, 467 (1989), revd. on other grounds 914 F.2d 1417 (10th Cir.
1990).

As we stated above, the list brokers act solely on behalf of
the mailers.  The same list broker does not participate in every
transaction.  Rather, each mailer chooses its own list broker to
act on its behalf.  Additionally, petitioner does not exercise
any control over the list brokers or over the list manager when
it acts in its capacity as list broker.  Petitioner directs all
rental inquiries to the list manager.[10]  Consequently, even if a
mailer or a broker contacts petitioner directly, petitioner has

_____

[10]    Petitioner only deals directly with inquiries from its
affiliates.

no dealing with that mailer or broker. Moreover, although the list broker's commission is factored into the base price that is listed on the data cards describing petitioner's rental list, the bill sent by the list manager includes a list broker's commission only where the list manager acts as the list broker. If the mailer uses an independent list broker, the list manager sends that list broker a bill that does not include a list broker's commission. Accordingly, it remains the list broker's choice whether to charge the mailer any list brokerage commission. On the basis of the foregoing, we conclude that the list brokers and list manager, when it is acting in its capacity as list broker, are not agents of petitioner, and, therefore, neither their activities nor the compensation that they receive for those activities can be attributed to petitioner. Consequently, the list brokerage activities do not change the character of the remainder of the mailers' list rental payments.

In sum, we hold that with the exception of the list brokerage activities (which are not attributable to petitioner), all of the activities in which the parties to the list rental transaction engage are royalty-related activities. Consequently, with the exception of the list brokerage commissions (which are not attributable to petitioner), the mailer's list rental payment in each list rental transaction is a royalty which is excluded

from UBTI under section 512(b)(2).  Our holdings obviate the need to address respondent's trade or business arguments.

Respondent's Remaining Arguments

No Written Licensing Agreement

Respondent contends that the list rental payments are not royalties because there is no written licensing agreement between petitioner and the list manager, CMS, or Triplex.  We conclude that, even though there is no written agreement termed a "licensing agreement", the terms and conditions of the transaction between the mailer and petitioner require the mailer to receive only a one-time right to use the information contained on petitioner's rental list.  Accordingly, we conclude that each mailing list transaction represents a separate licensing of petitioner's list by the mailer and that the absence of a written "licensing agreement" does not prevent the mailer's list rental payment from being a royalty.

Section 513(h)

Finally, respondent argues that the enactment of section 513(h) precludes a conclusion that the list rental payment is a royalty.  The relevant parts of section 513(h) provide:

SEC. 513(h).  Certain Distributions of Low Cost Articles Without Obligation to Purchase and Exchanges and Rentals of Member Lists.--

(1) In general.--In case of an organization which is described in section

501 and contributions to which are deductible under paragraph (2) or (3) of section 170(c), the term "unrelated trade or business" does not include--

\*      \*      \*      \*      \*      \*

(B) any trade or business which consists of--

(i) exchanging with another such organization names and addresses of donors to (or members of) such organization, or

(ii) renting such names and addresses to another such organization.

Section 513(h) provides a safe harbor for the rental and exchange of mailing lists between certain charities.  Section 513(h) was enacted during 1986, after the decision of the Court of Claims in DAV I.  Respondent argues that, in enacting section 513(h) and specifically excluding the income from mailing list transactions between charities, Congress has agreed with the holding of the Court of Claims in DAV I that the mailer's list rental payment in a mailing list transaction is not a royalty that is excludable from UBTI under section 512(b)(2).

We do not agree.  On the day of the adoption of the conference report accompanying the bill which included section 513(h), Representative Daniel Rostenkowski (D-Ill.), Chairman of the Ways and Means Committee, commented:

I also have discussed with Congressman Duncan [(R-Tenn.) Ranking Republican Member of the Ways and Means Committee] the issue of whether the provision of the bill which excludes certain income from unrelated trade or business income creates any inference under present law.  We have reached a common understanding regarding the following specific issue:

The question relates to section 1601 of the bill which excludes from unrelated trade or business income revenues from the use of a tax-exempt organization's mailing list by another such organization.  Section 1601 of the bill, which specifically exempts certain such revenues from the tax on unrelated business income in the future, carries no inference whatever that mailing list revenues beyond its scope or prior to its effective date should be considered taxable to an exempt organization.  [132 Cong. Rec. 26208 (Sept. 25, 1986).]

Additionally, the General Explanation provided by the Staff of the Joint Committee on Taxation explains:  "No inference is intended as to whether or not revenues from mailing list activities other than those described in the provision, or from mailing list activities described in the provision, but occurring prior to the effective date, constitute unrelated business income."  Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 1325 (J. Comm. Print 1987).  We conclude that the enactment of section 513(h) does not require that we hold that the revenues from the rental of petitioner's mailing list during the years in issue are UBTI and thus subject to UBIT.[11]

---

[11]    Respondent also contends that the list rental payments

(continued...)

We have considered the parties' remaining arguments and conclude that they are without merit, irrelevant, or unnecessary to reach.

To reflect the foregoing,

<u>Decision will be entered for petitioner</u>.

---

[11](...continued)
cannot be royalties because petitioner paid "development" or "production" costs.  Respondent borrows those terms from the mineral royalty context, and we conclude that they are not helpful to our inquiry.