149 T.C. No. 22

UNITED STATES TAX COURT

NEW JERSEY COUNCIL OF TEACHING HOSPITALS, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2822-16.                         Filed December 20, 2017.

P is a tax-exempt charitable organization described in I.R.C. sec. 501(c)(3) whose exempt purposes include promoting health care and medical education. During its calendar tax years 2004-2007, P contracted with third-party vendors, V1 and V2, to provide its members (hospitals and a medical school) access to debt-collection services and group purchasing programs. P received fees from V1 and V2 in exchange for administering these programs and promoting the programs to its members.

On its Forms 990, Return of Organization Exempt From Income Tax, P treated all of these receipts as "substantially related" to the conduct of its tax-exempt purposes, see I.R.C. sec. 513(a), and thus as exempt from Federal income tax. The IRS selected P's returns for examination and determined that the fees it received from V1 and V2 constituted unrelated business taxable income (UBTI) subject to unrelated business income tax (UBIT) under I.R.C. secs. 511(a)(1) and 512(a).

1. Held: The fees P received from V1 represented payments for services, not for the use of intangible property, and thus did not constitute "royalties" within the meaning of I.R.C. sec. 512(b)(2).

2. Held, further, the business activities that gave rise to the fees P received from V1 and V2 were not "carried on * * * primarily for the convenience of its members" within the meaning of I.R.C. sec. 513(a)(2).

3. Held, further, given the inapplicability of the exclusions in I.R.C. secs. 512(b)(2) and 513(a)(2), the fees P received from V1 and V2 were subject to UBIT because they were derived from an "unrelated trade or business" that P regularly carried on.

T. J. Sullivan and Joseph A. Rillotta, for petitioner.

Joan Casali and Mark L. Hulse, for respondent.

OPINION

LAUBER, Judge: With respect to petitioner's calendar tax years 2004, 2005, 2006, and 2007, the Internal Revenue Service (IRS or respondent) determined deficiencies in unrelated business income tax (UBIT) under section 511(a)(1) as follows:[1]

---

[1]All statutory references are to the Internal Revenue Code (Code), in effect for the tax years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

| Year | Deficiency |
|------|-----------|
| 2004 | $51,104 |
| 2005 | 156,502 |
| 2006 | 234,193 |
| 2007 | 319,527 |

Although petitioner is exempt from Federal income tax under section 501(a) and (c)(3), it is subject to tax on its "unrelated business taxable income" (UBTI). See secs. 511(a)(1), 512(a)(1). The question presented is whether fees petitioner received under certain contracts with third parties are excluded from UBTI as "royalties" under section 512(b)(2) or as amounts received in a trade or business "carried on * * * primarily for the convenience of its members" under section 513(a)(2). We conclude that neither of these exclusions applies and hence that the fees petitioner received are subject to UBIT.

## Background

The parties submitted this case for decision without trial under Rule 122. The stipulation of facts and the attached exhibits are incorporated by this reference. Petitioner had its principal place of business in New Jersey when it filed its petition.

Petitioner was incorporated in 1986 as University Health Systems of New Jersey, Inc. In February 2001 it changed its name to New Jersey Council of

Teaching Hospitals. Since its incorporation petitioner has been a membership organization whose members consist primarily of teaching hospitals operating in New Jersey. At all relevant times petitioner's board of trustees has consisted of petitioner's president and the chief executive officer (CEO) of each of its members.

In November 1988 the IRS issued petitioner a determination letter recognizing it as exempt from Federal income tax under section 501(a) and (c)(3). The IRS classified petitioner as a public charity rather than a private foundation by virtue of its status as a "supporting organization," i.e., an entity organized and operated "exclusively for the benefit of, to perform the functions of, or to carry out the purposes of" one or more public charities. Sec. 509(a)(3)(A). The entities petitioner supports are its members, all of which are tax-exempt organizations as specified in section 509(a)(1) or (2).

In its application for tax exemption petitioner stated that its "charitable objectives, like those of its supported organizations, are to further undergraduate and graduate medical education, to coordinate such education with the clinical programs available in [its affiliated] hospitals, and to help provide innovative and cost efficient health care delivery systems" in New Jersey. On its Forms 990, Return of Organization Exempt From Income Tax, for 2004-2007, petitioner defined its ex-

empt purposes to include "promoting health care, medical education and techno-
logy by studying and improving graduate medical education" and "articulat[ing] a
vision of a superior healthcare system for all New Jerseyans." Petitioner incurred
the following expenses in advancing these goals:

| Year | Expenses |
|------|----------|
| 2004 | $1,895,228 |
| 2005 | 2,214,338 |
| 2006 | 2,299,562 |
| 2007 | 2,633,921 |

During 2004-2007 petitioner's members consisted of 9 to 11 teaching hospi-
tals, one nonteaching hospital, and one medical school. Each member paid annual
dues. The dues for major teaching hospitals were generally set at $257,500 per
year; other members paid annual dues between $25,750 and $130,000. During the
tax years at issue petitioner received dues from its members as follows:

| Year | Dues |
|------|------|
| 2004 | $1,570,750 |
| 2005 | 1,828,250 |
| 2006 | 1,893,250 |
| 2007 | 1,932,500 |

Besides dues income, petitioner received fees under contracts with third par-
ties. Petitioner's "business model" was to offer various programs and services to
its members. If its members patronized or contracted with the third parties who

supplied these programs and services, the third parties would make payments to petitioner based on the revenues thus derived.

The third-party programs and services petitioner offered to its members during 2004-2007 included credit cards, internet services, research and polling, equipment maintenance, transportation services, debt collection, and group purchasing arrangements. The revenues at issue in this case were derived from agreements with two third parties: OSI Collection Services, Inc. (OSI),[2] which provided debt-collection services, and Greater New York Hospital Association (GNYHA), which provided (directly or through affiliates) group purchasing programs.[3]

A.    OSI Agreement

OSI was formerly known as Payco-General American Credits, Inc. (Payco). In July 1992 petitioner and Payco executed a contract, captioned "Service Agreement," that was renewed periodically through the tax years at issue. This agreement recites that petitioner "had been appointed purchasing agent by certain of its

_____

[2]During 2004-2007 OSI was a subsidiary of Outsourcing Solutions, Inc. For convenience we will refer to OSI and its parent collectively as OSI.

[3]Petitioner also appears to have derived fees during 2004-2007 from third parties that supplied its members with transportation services and research and polling services. The aggregate amounts of these fees were $2,402 in 2004, $3,273 in 2005, $5,042 in 2006, and $4,535 in 2007. The notice of deficiency did not include these amounts in petitioner's UBTI.

members" and that petitioner "desire[d] to recommend the services of Payco to its members" under the conditions stated in the agreement. For its part, Payco agreed to provide petitioner's current and future members, in exchange for specified fees, "a full range of collection services for primary accounts, secondary accounts, and accounts subject to litigation."

Article 1 of the agreement, captioned "Purpose," states that petitioner "hereby endorses Payco as a * * * collection agency and shall advise its members that Payco is one of * * * [petitioner's] selected vendors." Article 3, which sets forth petitioner's "Rights and Responsibilities," provides that petitioner "shall endorse Payco as a * * * collection agency" and shall "advise its members that * * * Payco is one of [petitioner's] selected vendors to provide collection agency services." Neither these nor any other provisions of the agreement license Payco to use petitioner's intangible property or obligate petitioner to make intangible property available to Payco. Nowhere in the agreement is there any reference to tangible or intangible property owned by petitioner.

To fulfill its obligations under the OSI agreement, petitioner listed OSI in the "member services" section of its website. This listing included OSI's logo, a "hot link" to OSI's website, and a paragraph-long description of OSI's offerings. During several board meetings petitioner's president encouraged the CEOs of its

member hospitals to hire OSI to perform their debt collection services, representing that OSI's fees were important to petitioner's financial stability. Petitioner provided OSI with a list of its member hospitals, but that list was already publicly available on petitioner's website, along with the names and phone numbers of the hospitals' CEOs and chief financial officers.

In article 2 of the agreement, captioned "Payco's Rights and Responsibilities," Payco agreed to pay petitioner "for its services as group purchasing organization a fee equal to three percent (3%) of the amount collected on * * * [petitioner's] members' accounts placed with Payco." Additionally, "in consideration for the coordination and liaison services to be provided by * * * [petitioner] in its capacity as group purchasing agent," Payco agreed to pay petitioner a distinct 3% fee "pursuant to a separate agreement" previously executed. During the tax years at issue, OSI (as successor to Payco) paid petitioner aggregate fees as follows:

| Year | Fees |
|------|------|
| 2004 | $97,577 |
| 2005 | 157,304 |
| 2006 | 165,049 |
| 2007 | 120,399 |
| Total | 540,329 |

During 2004 three of petitioner's nine dues-paying members participated in the OSI program. During 2005 three of petitioner's ten dues-paying members par-

ticipated in the OSI program. During 2006 three of petitioner's 11 dues-paying members participated in the OSI program. During 2007 four of petitioner's ten dues-paying members participated in the OSI program. Members who chose not to participate in the OSI program were free to contract with other debt-collection service providers. Petitioner did not track or assess, and cannot now quantify, the extent to which its members saved money as a result of discounts or favorable prices offered by OSI.

B.    GNYHA Agreement

In 2002 Health Alliance, Inc., a for-profit affiliate of petitioner, entered into a "management agreement" with GNYHA.[4]  Under this agreement Health Alliance was paid a share of the fees that GNYHA received as a result of enrollment by petitioner's members in certain group purchasing programs. This agreement applied only with respect to hospitals that did not have contracts with GNYHA before becoming members of petitioner. The agreement had an initial term of two years but was extended periodically through the tax years at issue.

Health Alliance subsequently assigned to petitioner all of its rights and obligations under the GNYHA agreement. Health Alliance filed its final Federal in-

---

[4]Certain activities under this agreement were performed by affiliates of GNYHA, including GNYHA Services, Inc., and GNYHA Ventures, Inc. For convenience we will refer to these entities collectively as GNYHA.

come tax return for its 2003 tax year and apparently became dormant sometime the following year. Thus, during the tax years at issue, all fee payments under the GNYHA agreement were received by petitioner.

During 2004-2007 GNYHA offered hospitals in New York, New Jersey, and Connecticut the opportunity to select purchasing agreements from two portfolios: its own "regional portfolio" and a "national portfolio" offered in conjunction with Premier, Inc., a national healthcare group purchasing organization. The products and services that hospitals might purchase in this way included medical and surgical supplies, pharmaceuticals, imaging and cardiology products, nutrition services, operating room instruments, and various types of capital equipment. If a hospital enrolled in either program, it was able to purchase products and services from vendors at discounted prices that GNYHA and Premier had negotiated with those vendors.

Under the 2002 agreement petitioner received "sales-related administrative fees" for promoting GNYHA's group purchasing programs to its members and for helping to administer those programs (e.g., by distributing application forms and instructions). Petitioner listed GNYHA in the "member services" section of its website. This listing included a description of GNYHA's offerings, a "hot link" to its website, and the name and telephone number of a GNYHA contact person.

The fees petitioner received from GNYHA were labeled "commissions" in petitioner's financial statements. These commissions were calculated as a percentage of the fees that vendors paid GNYHA and/or Premier with respect to purchases by petitioner's members who chose to participate in the group purchasing programs. During the tax years at issue GNYHA paid petitioner fees as follows:

| Year | Fees |
|------|------|
| 2004 | $77,407 |
| 2005 | 303,996 |
| 2006 | 524,754 |
| 2007 | 820,388 |
| Total | 1,726,545 |

During 2004 three of petitioner's nine hospital members participated in a GNYHA group purchasing program. During 2005 six of petitioner's ten hospital members participated in a GNYHA group purchasing program. During 2006 six of petitioner's 11 hospital members participated in a GNYHA group purchasing program. During 2007 seven of petitioner's ten hospital members participated in a GNYHA group purchasing program. Members who chose not to enroll with GNYHA were free to enter into group purchasing agreements with Premier directly or to participate in arrangements offered by other providers, such as the Voluntary Hospitals of America.

During 2004-2007 a hospital was not required to belong to an association such as petitioner in order to participate in GNYHA's group purchasing programs. Hospitals received essentially the same vendor discounts regardless of whether they joined individually or through an association. However, whereas GNYHA paid fees to petitioner when its members enrolled through it, GNYHA did not pay fees to hospitals that enrolled individually (and would not have paid fees to petitioner's members had they done so). Petitioner did not track or assess, and cannot now quantify, the extent to which its members saved money (in absolute terms or in comparison with other group purchasing programs available to them) as a result of discounts made available through GNYHA.

C.    IRS Examination

Petitioner timely filed Form 990 for each year at issue. On these returns it treated all of its receipts as "substantially related" to the conduct of its tax-exempt purposes, see sec. 513(a), and thus as exempt from Federal income tax. It did not include with any of these returns Form 990-T, Exempt Organization Business Income Tax Return.

Following an examination of these returns the IRS sent petitioner a timely notice of deficiency determining that the fees it had received from OSI and GNYHA constituted UBTI subject to tax under sections 511(a)(1) and 512(a).

The IRS determined that petitioner had "marketed and administered" the GNYHA program and that this activity was not substantially related to its educational purposes. The IRS likewise concluded that the fees received from OSI were subject to UBIT, concluding that a charity's need for "revenues to accomplish its charitable mission does not make a questioned activity related to its exempt purposes."

In reaching these conclusions the IRS rejected petitioner's reliance on section 513(a)(2), which provides that an "unrelated trade or business" does not include an activity "which is carried on * * * by the organization primarily for the convenience of its members." According to the IRS, petitioner's efforts to secure "economic benefit[s] due to bulk marketing" did not constitute an activity undertaken primarily for its members' convenience. The IRS likewise rejected petitioner's reliance on section 512(b)(2), which excludes "royalties" from UBIT. In the IRS' view, OSI and GNYHA were paying fees to petitioner, not for use of its intangible property, but for its services in endorsing, marketing, and administering those programs.

Petitioner timely petitioned this Court for redetermination of the deficiencies set forth in the notice. See supra p. 3. By order dated March 20, 2017, we granted the parties' motion to submit the case under Rule 122 for decision without trial.

Discussion

A.    Burden of Proof

The IRS' determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioner does not contend that the burden of proof should shift to respondent under section 7491. In any event, because only legal issues remain, the burden of proof is irrelevant. See, e.g., Nis Family Tr. v. Commissioner, 115 T.C. 523, 538 (2000).

B.    Governing Statutory Structure

Congress enacted the UBIT regime in 1950, prompted in part by a university's acquisition of a macaroni company. See Note, "The Macaroni Monopoly: The Developing Concept of Unrelated Business Income of Exempt Organizations," 81 Harv. L. Rev. 1280 (1968). The goal of these provisions was to level the playing field between for-profit companies and tax-exempt entities that engage in business activities. Otherwise, charitable and educational organizations could leverage their tax-exempt status to gain an unfair competitive advantage over businesses required to pay the corporate income tax. See United States v. Am. College of Physicians, 475 U.S. 834, 837-838 (1986); S. Rept. No. 81-2375, at 28 (1950), 1950-2 C.B. 483, 504.

Section 511(a)(1) imposes a tax at regular corporate tax rates on the UBTI of most charitable and educational organizations. Section 512(a)(1) defines UBTI as the "gross income derived by any organization from any unrelated trade or business * * * regularly carried on by it," subject to certain modifications and less allowable deductions.[5] Consistently with its legislative purpose, Congress excluded from UBTI most types of passive investment income, such as dividends, interest, and capital gains. See sec. 512(b)(1), (5). Among the excluded forms of passive income are "royalties." Sec. 512(b)(2).

Section 513(a) generally defines an "unrelated trade or business" as:

> any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501.

The statute provides three exceptions to this general rule. The exception relevant here, set forth in section 513(a)(2), provides that an "unrelated trade or business" does not include a trade or business that an organization carries on "primarily for the convenience of its members, students, patients, officers, or employees."

---

[5]Petitioner does not contend that it incurred any allowable deductions for expenses incurred in generating its fee income from OSI and GNYHA.

C.    Analysis

Petitioner concedes that the activities by which it earned fees from OSI and GNYHA constituted a "trade or business," that this business was "regularly carried on," and that the conduct of this business was "not substantially related" to the performance of its educational purposes.  But it urges that these fees were nevertheless exempt from UBIT on the grounds that its fees from OSI constituted "royalties" and that its fees from both vendors were derived from a business "carried on * * * primarily for the convenience of its members."  We address these contentions in turn.

1.    Royalty Exclusion

Section 512(b)(2) excludes from UBTI "all royalties (including overriding royalties) whether measured by production or by gross or taxable income from the property."  The regulations do not define "royalty," except to indicate that the term includes "mineral royalties."  Sec. 1.512(b)-1(b), Income Tax Regs.  Whether an item of income constitutes a royalty is to be determined "by all the facts and circumstances of each case."  Id. sec. 1.512(b)-1 (first sentence).

As relevant here, "royalties" are "payments for the right to use intangible property."  Sierra Club, Inc. v. Commissioner, 86 F.3d 1526, 1532 (9th Cir. 1996), aff'g in part, rev'g in part, and remanding 103 T.C. 307 (1994); see Disabled Am.

Veterans v. Commissioner, 94 T.C. 60, 70 (1990) (concluding that "royalties" for purposes of section 512(b)(2) "are payments for the use of valuable intangible property rights"), rev'd on other grounds, 942 F.2d 309 (6th Cir. 1991). We have held that "royalties" include payments to a tax-exempt organization for use of such intangible assets as its name, logo, service marks, and membership list. See, e.g., Common Cause v. Commissioner, 112 T.C. 332 (1999); Planned Parenthood Fed'n of Am., Inc. v. Commissioner, T.C. Memo. 1999-206; Sierra Club, Inc. v. Commissioner, T.C. Memo. 1999-86, 77 T.C.M. (CCH) 1569, 1575.[6]

On the other hand, "royalties" for purposes of section 512(b)(2) "cannot include compensation for services rendered by the owner of the property." Sierra Club, 86 F.3d at 1532. For example, in Texas Farm Bureau v. United States, 53 F.3d 120 (5th Cir. 1995), an insurance company paid a tax-exempt organization to "use its good offices, influence and prestige" to promote the companies' life insurance plans and provide various administrative services. The Court of Appeals held these fees subject to UBIT, reasoning that "the plain language of the agree-

---

[6] See also Disabled Am. Veterans, 94 T.C. at 70-71 (noting that "royalties" are generally defined to include payments for "the rights to use copyrights, literary works, motion picture rights, and dramatic rights"). The Commissioner has ruled that "royalties" for purposes of section 512(b)(2) include proceeds derived by a tax-exempt organization from licensing the use of its members' names, photographs, likenesses, and facsimile signatures. Rev. Rul. 81-178, 1981-2 C.B. 135.

ments demonstrates that the agreements were strictly for services and did not contemplate a royalty payment." Id. at 124; see Nat'l Water Well Ass'n, Inc. v. Commissioner, 92 T.C. 75, 100-101 (1989) (ruling that "a royalty is a payment for the use of a valuable right" and that "compensation for services rendered" does not constitute royalty income); cf. Sierra Club, 77 T.C.M. (CCH) at 1579 (holding that the organization's receipts were not received "in consideration for services provided" but rather "in consideration for the use of * * * intangible property").

Petitioner's contract with OSI was captioned "Service Agreement." Petitioner thereby agreed to advise its members that OSI was a "selected vendor," to endorse OSI as a collection agency, and to provide various administrative services. In exchange for petitioner's "services as group purchasing organization" and its "coordination and liaison services," OSI agreed to pay petitioner specified fees.

Nowhere in the agreement does petitioner license OSI to use its intangible property or obligate itself to make intangible property available to OSI. Indeed, the agreement makes no reference whatever to tangible or intangible property owned by petitioner. That being so, it is hard to see how the fees petitioner received under the agreement could be regarded as "royalties * * * measured by production or by gross or taxable income from the property." See sec. 512(b)(2) (emphasis added).

Petitioner urges that the services it actually provided OSI were quite modest. It listed OSI on the "member services" page of its website, which displayed OSI's name and logo, supplied a "hot link" to OSI's website, and provided a paragraph-long description of OSI's offerings. During several board meetings petitioner's president encouraged the CEOs of its member hospitals to hire OSI to perform their debt collections, representing that OSI's fees were important to petitioner's financial stability. Hypothesizing that this volume of services could not have been worth the $540,329 it received from OSI during 2004-2007, petitioner urges that OSI must in fact have been paying for something else. That "something else," petitioner says, was "OSI's acquisition of the right to associate its name and mark with * * * [petitioner's] name and mark" and with petitioner's "reputation with its members." In petitioner's view, this was "the crux of the contract."

This argument is unpersuasive because petitioner has failed to identify any intangible property of its own that it licensed OSI to use. The placement of OSI's trademark on petitioner's website obviously did not constitute the use of petitioner's intangible property by OSI; rather, it constituted the rendition of a service to OSI by petitioner. And while petitioner's "reputation" might be described as an intangible asset, petitioner did not license OSI to use petitioner's reputation. Rath-

er, petitioner exploited its own reputation with its members by endorsing OSI and inducing its members to patronize that company.

It is not our role to second-guess the value that OSI placed on petitioner's endorsement and administrative services. By agreeing to endorse OSI as one of its "selected vendors," petitioner directed to OSI's door a potentially large stream of revenue, and OSI agreed to pay petitioner at least 3% of the resulting receipts. The fact that petitioner's share of these receipts amounted to $540,329 simply attests to the depth of that revenue stream; it creates no inference that OSI was paying petitioner for the right to use some unspecified intangible property. We conclude that OSI was paying petitioner for its services, not for the use of its intangible property, and that the OSI fees cannot be excluded from UBTI as "royalties" under section 512(b)(2).

2.      "Convenience" Exception

Section 513(a)(2) excepts from the definition of "unrelated trade or business" any trade or business "which is carried on, in the case of an organization described in section 501(c)(3) or in the case of a college or university described in section 511(a)(2)(B), by the organization primarily for the convenience of its members, students, patients, officers, or employees." Neither the Code nor the regulations explain the scope of this exception or define the term "convenience."

However, the regulations supply three examples of activities that qualify for the "convenience" exception: "the sale of books by a college bookstore to students," "the sale of pharmaceutical supplies by a hospital pharmacy to patients of the hospital," and "a laundry operated by a college for the purpose of laundering dormitory linens and the clothing of students." Sec. 1.513-1(c)(2)(ii), (e) (flush language), Income Tax Regs. These examples resemble those set forth in the legislative history. See H.R. Rept. No. 81-2319, at 37 (1950), 1950-2 C.B. 380, 409 (stating that, "[i]n the case of an educational institution, income from dining halls, restaurants, and dormitories operated for the convenience of the students" would qualify for the section 513(a)(2) exception).

The Commissioner has expanded on these examples in a series of revenue rulings.[7] Elaborating on one regulatory example, the IRS has ruled that a laundry

---

[7]We are not bound by revenue rulings. Under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), the weight we afford them depends upon their persuasiveness and the consistency of the Commissioner's position over time. PSB Holdings, Inc. v. Commissioner, 129 T.C. 131, 142 (2007) ("[W]e evaluate the revenue ruling under the less deferential standard enunciated in Skidmore [.]"); see United States v. Mead Corp., 533 U.S. 218, 234 (2001) (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984) ("Chevron did nothing to eliminate Skidmore's holding that an agency's interpretation may merit some deference whatever its form [.]")) The Commissioner's rulings on the "convenience exception" date back to 1955 and reflect a consistent position. We conclude that these rulings are entitled to some deference. See Webber v. Commissioner, 144 T.C. 324, 352-353, 357-358 (2015).

and dry-cleaning plant operated by a university primarily to serve its students and faculty qualified for the "convenience" exception, even though some members of the public were also served. Rev. Rul. 55-676, 1955-1 C.B. 266. The Commissioner has similarly ruled that the operation of vending machine facilities on a college campus, including food and soft drink vending and laundromat facilities, would qualify for the "convenience" exception. Rev. Rul. 81-19, 1981-1 C.B. 353, 354. The Commissioner concluded that "[t]he goods and services dispensed by the vending machines are necessary for the day-to-day living on the campus of students, faculty, and staff." Accordingly, these activities "further[ed] the educational program of the university" and qualified for the section 513(a)(2) exception "by operating facilities for the convenience of the university community." Ibid.; see also Rev. Rul. 58-194, 1958-1 C.B. 239, 240-241 (holding that an organization operating a bookstore and cafeteria on a college campus for the convenience of students and faculty qualified for exemption under section 501(c)(3)).

On the other hand, distinguishing another of the regulatory examples, the Commissioner has ruled that sales of pharmaceutical supplies by a tax-exempt hospital to members of the general public, or to private patients of physicians practicing in a building owned by the hospital, do not qualify for the "convenience" exception. Rev. Rul. 68-375, 1968-2 C.B. 245; Rev. Rul. 68-374, 1968-2 C.B.

242. The Commissioner reasoned that "[t]he buyer-seller relationship between these off-street patrons and the pharmacy" was insufficient to classify them as "patients" of the hospital. Rev. Rul. 68-374, 1968-2 C.B. at 243. The Commissioner concluded that these revenues were subject to UBIT because there was "no substantial causal relationship between the achievement of the hospital's exempt purposes and the sale of pharmaceutical supplies" to such individuals. Ibid.; Rev. Rul. 68-375, 1968-2 C.B. at 246.

Read together, these examples suggest that a business conducted by a university or a hospital will be regarded as carried on for the convenience of its students or patients if the business activity assists those individuals in their capacity as such, viz., by helping them be better students or healthier patients. On-campus cafeterias assist students in fulfilling their role as students by facilitating student interaction before and after class. On-campus dormitories allow students to live close to classrooms and libraries and share quarters with fellow students. On-campus bookstores, laundromats, and vending machines enable students to obtain day-to-day living necessities without the inconvenience of traveling to distant off-campus locations. And operation of a pharmacy helps hospital patients stay healthier by enabling them to secure needed drugs and supplies without endangering their health by leaving the premises. In each case, the university or hospital

furthers its own educational or health-advancement purpose by helping the recipients of its services to perform better.  See also St. Luke's Hosp. v. United States, 494 F. Supp. 85, 92 (W.D. Mo. 1980) (pathology tests performed by hospital primarily for convenience of member physicians).

The case law on this subject, while sparse, supports this interpretation of the "convenience" exception.  See Am. College of Physicians v. United States, 3 Cl. Ct. 531 (1983), rev'd on other grounds, 743 F.2d 1570, 1577 (Fed. Cir. 1984), rev'd on other grounds, 475 U.S. 834 (1986).  The question addressed by the Supreme Court in that case was whether a medical association's publication of commercial advertising in its medical journal was "substantially related" to its tax-exempt purposes.  See Am. College of Physicians, 475 U.S. at 835-836.  But the College advanced an alternative argument at the trial and appellate levels, namely, that its advertising activity was "carried on primarily * * * for the convenience its members" within the meaning of section 513(a)(2).  The Claims Court rejected that argument, and its holding to this effect was affirmed on appeal.  See Am. College of Physicians, 743 F.2d at 1577.

The Claims Court's reasoning is instructive here.  The College contended that journal advertising served the convenience of its physician members by bringing to their attention new medical products and positions offered in classified ads.

The court assumed that this advertising might benefit the College's members in their capacity as practicing physicians. Am. College of Physicians, 3 Cl. Ct. at 536. But it found the "convenience" exception unavailable because the advertising was not published for the convenience of members in their capacity as such:

> The members' interests as members concern such matters as attending the College's educational functions, participating in research and testing, disseminating health information to the public and promoting quality medical education. The members' interests as physicians are much broader and include all aspects of medical practice. * * * [Ibid.]

Although journal advertising might "assist practicing physicians by informing them of new products [or] publicizing the availability of positions," the court found that the College's advertising "does not * * * have any connection with their responsibilities as members of the College." Ibid. It accordingly ruled that the College's advertising business was not carried on "for the convenience of its members" within the meaning of section 513(a)(2).

Petitioner contends that its activities under the GNYHA contract were undertaken for the purpose of "providing members access to discounted supplies and services" and "generating non-dues revenue to support * * * [its] operations on behalf of its members." Its activities under the OSI contract were allegedly undertaken for the purpose of "refer[ring] to its members a vetted and reliable collec-

tions vendor." Because its business activity allegedly assisted its members in these ways, petitioner insists that this activity was carried on primarily for their convenience.

We reject this contention for a variety of reasons. First, by helping its members save time or money by directing them to low-cost or high-quality vendors, petitioner was not serving "the convenience of * * * [its] members in their capacity as members." Am. College of Physicians, 3 Cl. Ct. at 535. The members' interests as members may include attending petitioner's educational functions and participating in its research programs. Petitioner might serve its members' convenience in their capacity as members (for example) by providing travel services in connection with its conferences or by contracting with research or consulting firms. Although helping its members save money might improve the hospitals' balance sheets, it would not provide a convenience to them in their capacity as members of petitioner. Nor would it enable petitioner to advance its own educational purposes, as a university does by serving the convenience of its students in their capacity as students.

Second, petitioner has not established that its activity benefitted its members in any meaningful way. Petitioner did not track or assess, and cannot now quantify, the extent to which its members saved money (in absolute terms or in compar-

ison with other programs available to them) as a result of discounts or favorable prices offered by GNYHA or OSI. Hospitals were not required to belong to an association like petitioner in order to participate in GNYHA's group purchasing programs, and they received essentially the same vendor discounts regardless of whether they joined individually or through an association. Petitioner insists that it served its members' convenience, "if only in terms of saved time and effort," by vetting OSI through a request for proposals. But this alleged vetting was conducted in 1991, more than a decade earlier. And only a third of petitioner's members signed up for the OSI program, suggesting that its benefits were not obvious. Petitioner cannot show that these activities were conducted "primarily for the convenience of its members" without showing that the activities plausibly benefitted its members in some way.

Third, even if petitioner's business activity saved its members money, there is no legal support for the notion that saving money, without more, is enough to qualify for the "convenience" exception in section 513(a)(2). There is nothing in the statute or its legislative history, in the regulations promulgated by the Secretary, or in the rulings issued by the Commissioner, to suggest that saving money is an important (or even a relevant) consideration. A university's operation of on-campus cafeterias and laundromats might save students (or their parents) money

by offering lower prices than those available commercially. But there is no evidence that considerations of this sort played any role in Congress' enactment of the "convenience" exception. Indeed, petitioner's "money saving" theory is hard to reconcile with Congress' overall purpose in enacting the UBIT provisions, which was to eliminate unfair competition between tax-exempt and taxpaying businesses.

Petitioner's "money saving" theory also proves too much. Tax-exempt organizations could engage in a wide array of businesses that might save time or money for their members, students, patients, officers, or employees, by selling directly to those individuals or by directing them to low-cost or high-quality vendors. Were section 513(a)(2) construed as petitioner urges, it "would significantly undercut the purpose of the UBIT" because "there would be no end to the types of goods and services an organization could provide its members while avoiding tax on the income so derived." Am. College of Physicians, 3 Cl. Ct. at 535.[8]

---

[8]Insurance programs are one example of a business that might qualify under petitioner's interpretation of the "convenience" exception. Many tax-exempt organizations sponsor or endorse insurance plans for their members, receiving fees from the insurance companies when their members sign up. Such organizations may plausibly contend that these plans have been well vetted and may save their members time or money. But it is well established that this activity generally constitutes an "unrelated trade or business" the revenues from which are subject to UBIT. See, e.g., United States v. Am. Bar Endowment, 477 U.S. 105, 119 (1986);

(continued...)

Fourth, even if petitioner's business activity were thought to provide a convenience to its members by saving them time or money, petitioner has not shown that it conducted this activity "<u>primarily</u> for the convenience of its members," as the statute requires. Sec. 513(a)(2) (emphasis added). In another tax context, the Supreme Court has interpreted the term "primarily' to mean "of first importance" or "principally." <u>Malat v. Riddell</u>, 383 U.S. 569, 572 (1966) (construing section 1221(1)). As the Claims Court concluded in <u>Am. College of Physicians</u>, "[t]here seems to be no reason to depart from this common sense definition in interpreting section 513(a)(2)." 3 Cl. Ct. at 536.

During 2004-2007 petitioner derived aggregate fees of $2,266,874 (approximately 23% of its total revenue) under its contracts with OSI and GNYHA. As petitioner's president emphasized to his fellow board members, these revenues were important to petitioner. Petitioner's annual expenditures substantially exceeded the dues its members paid; in 2007, the gap between expenditures and dues was more than $700,000. <u>See</u> <u>supra</u> p. 5. Without the fees it received from OSI and GNYHA, petitioner would have been forced to curtail its activities (or raise its dues) significantly. Even if petitioners' members were thought to have derived

---

[8](...continued)
<u>Texas Farm Bureau</u>, 53 F.3d at 126; <u>Am. Postal Workers Union, AFL-CIO v. United States</u>, 925 F.2d 480, 483-485 (D.C. Cir. 1991).

some incidental benefit from the conduct of these two businesses, it seems clear that petitioner's <u>primary</u> purpose for engaging in these activities was to raise revenue for itself. See <u>Am. College of Physicians</u>, 3 Cl. Ct. at 536.[9]

If raising revenue were deemed its primary purpose, petitioner asserts that its fee-generating activity nevertheless served its members' convenience by enabling it to conduct a broader range of charitable activities or by reducing the dues its members would otherwise have had to pay. But this is simply a variation on the "money saving" theory we have already rejected. See <u>supra</u> pp. 27-29. Petitioner offers no legal authority, and we have found none, to support the proposition that a desire to raise revenue (whether rebated to members or not) is sufficient to meet the requirements of the "convenience" exception.

The UBIT provisions adopt the general rule that an organization's business revenues are taxable unless the underlying activity is "substantially related" to its exempt purposes "aside from the need of such organization for income or funds or the use it makes of the profits derived." Sec. 513(a). Adoption of petitioner's premise--that raising revenue to support its operations is sufficient to meet the

---

[9]Hospitals were not required to belong to an association like petitioner in order to participate in GNYHA's group purchasing programs. But if petitioner's members participated through it rather than individually, GNYHA would pay petitioner substantial fees. This makes it clear that petitioner operated this business, not for its members' convenience, but primarily to raise revenue for itself.

"convenience" exception--would cause that exception to swallow this general rule. "In construing provisions * * * in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision." Commissioner v. Clark, 489 U.S. 726, 739 (1989).

For all these reasons, we find that the business activities giving rise to petitioner's fees from OSI and GNYHA were not "carried on * * * primarily for the convenience of its members" within the meaning of section 513(a)(2). Those revenues were thus derived from an "unrelated trade or business" that petitioner regularly carried on. The royalty exclusion of section 512(b)(2) being inapplicable, petitioner's fees constitute UBTI under section 512(a)(1) that is subject to UBIT under section 511(a)(1).

To implement the foregoing,

Decision will be entered for respondent.